Argued October 29, reversed with directions November 21, 1951

## DAHL ET AL. *v.* CRAIN ET UX.
237 P. 2d 939

*Pat H. Donegan,* of Burns, argued the cause and filed a brief for appellants.

*Robert H. Foley* argued the cause for respondents. On the brief were De Armond, Goodrich, Foley & Gray, of Bend.

Before BRAND, Chief Justice, and ROSSMAN, LUSK, LATOURETTE, WARNER and TOOZE, Justices.

TOOZE, J.

This is a suit for specific performance of a contract respecting the sale of standing timber, brought by Philip Dahl, Bessie Peterson, and the S. S. Johnson Company, dba Tite Knot Pine Mill, as plaintiffs, against E. W. Crain and Bernice L. Crain, husband and wife, as defendants. The trial court entered a decree in favor of plaintiffs, and defendants appeal.

The plaintiffs' complaint, after formal allegations as to the legal status of the parties, sets forth in usual form for specific performance the entry into a written contract between plaintiffs and defendants to purchase and sell respectively the merchantable Ponderosa pine timber from 200 acres of land located in section 10, township 21 South, range 24 East of the Willamette meridian, in Crook county, Oregon, and the payment of the consideration of $8,000 by the purchasers to the sellers. It then alleges the agreement of plaintiffs to resell the timber to Edward Hines Lumber Company, free of encumbrances, and the failure and refusal of defendants to remove the encumbrances which, by the contract, they were under obligation to do; that the removal of the encumbrances was necessary in order to permit plaintiffs to consummate their resale. And, in particular, the complaint alleges:

"* * * that in accordance with the agreement of said Hines Lumber Company plaintiffs and Hines Lumber Company caused a joint cruise of said timber to be accomplished and from said cruise it was determined that said *Tract (a) contained three million one hundred sixty thousand board feet of merchantable pine timber,* in accordance with the specifications for such cruise. That plaintiffs agreed to sell the same to said Hines Lumber Company for $10.00 per thousand board feet, or a total of $31,-600.00" (Italics ours.)

Plaintiffs prayed a decree for specific performance of the contract, and, in the event performance could not be had, that plaintiffs recover of defendants the sum of $31,600 as damages.

By their answer and stipulations entered into prior to trial, defendants admitted all the essential allegations of plaintiffs' complaint.

As an affirmative defense, defendants alleged that they had been induced to enter into the contract for the sale of said timber by reason of false representations made to them by plaintiffs respecting the number of board feet of merchantable Ponderosa pine timber located on said tract (a), these representations being that defendants' land contained between "one and one-half million and two million board feet of merchantable pine timber, and no more"; whereas, and in fact, said land contained "in excess of three million one hundred sixty thousand board feet of timber; to-wit, three million one hundred seventy-three thousand board feet of merchantable Ponderosa pine timber"; that they believed these representations to be true and relied upon them in entering into the agreement. Defendants then alleged that, immediately upon discovery of said fraud, they rescinded said contract and tendered back to plaintiffs the monies received by them on account thereof, which tender was refused; and that said monies were tendered into court with the answer. They also alleged a mutual mistake in the making of said agreement, but this claim was abandoned at the outset of the trial. Defendants prayed a decree dismissing plaintiffs' complaint and cancelling, annulling, and holding for naught the contract in question.

By their reply, plaintiffs denied all the new matter alleged in the answer.

The material portions of the contract in dispute are as follows:

"That the Seller, for and in consideration of the covenants and the premises of the Buyer hereinafter contained, and for and in consideration of the sale price hereinafter set forth, does hereby promise and agree to sell, and the Buyer does hereby promise and agree to buy *all merchantable Ponderosa Pine* belonging to the Seller located in Crook County, Oregon, lying near the Western Boundary of the Snow Mountain Unit of the Ochoco National Forest, consisting of two tracts of timber, (a) comprising approximately 200 acres located in Section 10, Township 21 South, Range 24 East. The second, (b), comprising scattering timber located in the tier of sections immediately west of the National Forest boundary in Township 21 South, Range 24 East.

*"All merchantable timber will be sold,* provided, however, that the Seller may reserve specific trees deemed necessary for the preservation of his range land.

"The Buyer is to pay $8000.00 *for all merchantable timber located in the tract described as (a) above.* The Buyer is to pay $3.75 per thousand for all logs scaled by a joint scaler using the Scribner Decimal C rule and deducting for all visible defects, in tract (b) indicated above * * *.

"* * * * * *

"Payment for tract (a) above shall be made immediately upon the acknowledgment of this contract by the Seller. Payment for Tract (b) above shall be made as the timber is felled and the logs are scaled. * * *

"* * * * *

"The Buyer agrees to abide by all Oregon State laws concerning forest practice, disposal of slash and fire control. The Seller agrees to pay all taxes levied against the land in which the Buyer is interested through this agreement, and keep this

same land free of all liens or encumbrances of any nature whatsoever.

"The Buyer agrees to sell the Seller a certain portion of land described as follows:

SE ¼ NW ¼; SW ¼ NE ¼; W ½ SE ¼ of Section 10, Township 21 South, Range 24 East W. M.

when the timber from said land has been removed.

"Agreed and subscribed to in duplicate the day, month and year first set forth above.

"(Sgd.) E. W. Crain
(Sgd.) Bernice L. Crain
SELLER
SNOW MOUNTAIN LUMBER COMPANY
By (Sgd.) Philip Dahl, President
BUYER

"In consideration of One Dollar we hereby sell and assign all of the rights and interest in the above contract to the Tite Knot Pine Mill.

"SNOW MOUNTAIN LUMBER COMPANY
By (Sgd.) Philip Dahl, President
(Sgd.) Sam S. Johnson, Secretary"
(Italics ours.)

It will be observed that this contract was executed on behalf of Snow Mountain Lumber Company by Philip Dahl, one of the plaintiffs herein, as president, and that the assignment of the contract to plaintiff Tite Knot Pine Mill was executed on behalf of said Snow Mountain Lumber Company by Philip Dahl, as president, and Sam S. Johnson, another of the plaintiffs, as secretary.

The evidence discloses that in all the negotiations leading up to the execution of the contract in dispute, the Snow Mountain Lumber Company was represented by its secretary, Sam S. Johnson. This also is true respecting dealings between plaintiffs and defendants

subsequent to the execution of the agreement; that is to say, defendants' dealings were largely, if not wholly, with Sam S. Johnson, as representative of himself and his associates.

It also appears from the record that before and at the time of the negotiations between Johnson and defendants, Johnson and Dahl were engaged in buying up other large tracts of merchantable timber in the vicinity of defendants' holdings and, in fact, had purchased from the Dant and Russell company a tract of timber located in the above-mentioned section 10, immediately adjacent to defendants' timber. The land upon which the Dant and Russell tract of timber was located is that particularly described in the latter part of the contract as above set forth.

In passing, we note plaintiffs' contention that, during the course of negotiations for the purchase of defendants' timber, it was the intention of Johnson and his associates to erect a medium-sized sawmill within the vicinity of the timber being purchased, for the purpose of manufacturing the same into lumber. However, there is no independent evidence in the record of any overt act on the part of Johnson and his associates toward the erection of any such mill at any time, and the alleged fact that the construction of such mill was contemplated rests entirely upon the self-serving and uncorroborated declarations of Johnson. In the light of subsequent events, viz., the acquiring of sixty-six million feet of timber in the same vicinity and the entering into arrangements for its sale to Hines Lumber Company (which was consummated in 1948), it may well be inferred that such construction was never really intended, but, on the contrary, the sole purpose of the purchasers was to buy timber for speculation. If that is the case, and we think it is, much of

what occurred in connection with the purchase of defendants' timber is better understood.

In October, 1945, defendants purchased on contract from one Clark, ten thousand acres of land located in Crook, Harney, Deschutes, and Lake counties, and also a lease to twenty thousand additional acres. They moved upon this land in November, 1945. Section 10 referred to above was a part of the deeded lands. Clark had exchanged the use of section 10 for the use of an equivalent tract of land more conveniently located in connection with his operations, and this exchange of use continued after defendants took possession. Section 10 was located entirely outside defendants' ranch operations. Up to the time of the negotiations between Johnson and defendants, defendants had never been on section 10, nor did they have any definite knowledge concerning the growth of any substantial amount of timber thereon. Virgil Ammons, a witness for plaintiffs, testified that he went to defendants' ranch in April, 1946, after Johnson had already been there, in an endeavor to purchase the timber in question, and in answer to the question, "Did you have any discussion with him [Crain] there then where the land was?," he said: "Faintly, he didn't know where it was." And in reply to the question, "Did he tell you that he was not familiar with the timber generally," Johnson said: "Yes, I think so."

On the other hand, Johnson and his timber cruiser had been upon that land while engaged in looking over the Dant and Russell holdings prior to the purchase thereof. He had observed defendants' stand of timber sufficiently to form a general idea as to the amount of it.

Before purchasing these lands in 1945, defendants had, for a number of years, resided in Tillamook

county. They there had been engaged in several occupations, viz.: for four years, they conducted a sporting goods store; for nine years, they operated a gasoline service station; for several years, defendant E. W. Crain was engaged in business as a distributor of General Petroleum products; and for a few years immediately prior to leaving Tillamook county, they operated a dairy ranch stocked with fifteen cows. They also reared some minks.

While operating their service station, defendants at times met and became acquainted with loggers and timber cruisers, though they never had any experience in logging or lumbering operations, nor in anything associated therewith. Although from their acquaintances they learned in a general way what was meant by "cruising timber" and "scaling logs," notwithstanding, they never learned the mechanics thereof. Tillamook county is one of the principal logging centers of the state. Large Douglas fir comprises the timber logged. It is reasonable to assume that any person living for any length of time in that section of Oregon —even a school boy—would gain some general knowledge relative to cruising and scaling operations, but the evidence here is conclusive that whatever knowledge defendants had regarding such matters was very limited. Moreover, the evidence discloses a vast difference between large fir and pine timber as respects the cruising and scaling activities.

In contrast, Johnson was reared and trained in the lumber and logging business. His whole adult life has been devoted to it. Johnson became so proficient in estimating the number of board feet in standing timber by merely looking it over that at times he and his associates purchased without a cruise, relying solely upon his estimate or "pretty good guess." His

experience was confined to Central Oregon pine timber of the type involved here. It is abundantly clear from the record that, in his line, Johnson is highly skilled; he is an expert.

In its findings of fact the trial court, after pointing out the respective business experiences of defendants and Johnson, found as follows:

"The court finds in the experience of the two individuals no preponderance of the experience of either above the other and *the parties dealt at arms length on an equal footing.*" (Italics ours.)

It may be conceded that, in business experience generally, defendants were on an equal footing with Johnson. But here we are not dealing with general business. We are concerned with a particular and highly specialized business, every angle of which was known to Johnson, but not to defendants. We cannot agree with the trial court that "the parties dealt at arms length on an equal footing." Attempting to compare the knowledge and experience of defendants with that of Johnson in relation to timber would be commensurate with trying to compare the experience and ability of an amateur boxer with that of a Jack Dempsey. There is no parallel.

This erroneous premise adopted by the trial court permeates its entire findings of fact upon which its conclusions of law and decree are based.

Let us briefly review the facts leading up to the execution of the contract of sale. Johnson went to defendants' ranch in early April, 1946, for the purpose of negotiating for the purchase of the Crain timber. Crain's testimony as to what took place not only at the first meeting, but also at subsequent meetings, is quite clear and definite; Johnson's statements are far

from being specific, but, on the contrary, he dealt largely in generalities when purporting to relate the conversations occurring during the negotiations he had with Crain. Yet from Crain's specific statements and Johnson's admissions in his testimony, we gather that little was accomplished at the first meeting. Crain indicated a willingness to sell, and Johnson, a desire to buy. However, Crain advised Johnson that he had not seen the timber and knew but little, if anything, about it. Crain states that at this first meeting Johnson produced a map showing the location of the timber, and that it was from Johnson he first learned there was a substantial amount of Ponderosa pine on his lands. Johnson at the time wanted to purchase the timber on a log scale basis, and they talked a price of $3.50 to $4.00 per thousand feet board measure. There also was a discussion about cruising the timber. Johnson informed Crain that the cruise perhaps would take three days to make at a cost of $50.00 per day. Johnson told Crain that he would meet any price offered by anyone else. However, nothing definite was accomplished at this first meeting.

Shortly after the Johnson visit, defendants were called upon at their home by Virgil Ammons, who, with his partner Endicott, operated a sawmill. Ammons had made a casual survey of defendants' timber and desired to purchase it. He thought the tract contained about two million board feet of timber and finally offered to pay for it at the rate of $4.00 per thousand feet. Crain informed him he would not sell except upon a cruise.

Some three or four weeks after his first visit, Johnson again called on Crain. Crain at that time also informed Johnson he would not sell without a cruise. Defendants suggested that they were ac-

quainted with some cruisers in Tillamook county, but Johnson pointed out that those cruisers were not likely to be familiar with cruising pine timber. He stated that he knew a capable cruiser, and that he would like to have a cruise made on his own account. In all their discussions merchantable timber only was considered. The parties finally reached an agreement whereby Johnson undertook to procure a cruiser to make the cruise with the understanding that, if defendants sold to Johnson, Johnson and his associates would pay for the cruise, but if defendants sold to anyone else, they, the defendants, would pay for it. It was understood that the cost would be approximately $150.

Pursuant to this understanding and agreement, Johnson secured one Hans C. Milius, an employee of the U. S. Forest Service, to make the cruise. Milius often had been employed by Johnson and his associates to do cruising for them. Inasmuch as this cruise was made under the instructions of Johnson, it is important to know what those instructions were. Milius testified on direct examination:

"Q Just a minute, before you say that, under what circumstances did you cruise it [Crain timber], how did you happen to cruise it?

"A I had done other work for Mr. Johnson, and I did not have any written instructions. I was working under this understanding that *I should take all timber* [which] *would render a net profit to the type of sawmill Mr. Johnson was planning to operate,* which would be considered merchantable to him,—*Any amount of timber which would not turn into a net profit for him, which could not be made into salable lumber by his type of sawmill, I was to disregard.* That would, at least, be equal to the cost of logging and manufacturing the lumber before a log would be considered merchantable. That is the way I did it. (Italics ours.)

"Q Were those the instructions that you were working under?

"A Those were the instructions, and I understood that I was to operate under them, yes.

"Q Who asked you to make the cruise?

"A Mr. Sam Johnson."

It took Milius about five hours to complete such cruise as he did make. He reported to Johnson that his cruise disclosed *one million nine hundred thousand board feet* on the tract. Milius testified:

"I told him [Johnson] of the volume and he told me he would accept a round number of 2,000,000 board feet net merchantable timber available log scale on that area. It would be the volume which he could safely expect to cut from the area, and he could make his bid best on this estimate."

Early in August, after the cruise had been made, Johnson resumed negotiations with defendants at their ranch. Defendant Crain testified:

"He pulled out a little spiral book, maybe 3½"x2½" and it [sic] thumbed it over and said that there was just about 1½ to 2 million feet of timber. That was the time that he told me how many feet of timber that he thought was on the place."

Johnson admitted that he told Crain the cruise disclosed between one and one-half million and two million board feet. Johnson did not offer to show the Milius figures to Crain, nor did Crain request an examination of them. At no time did Johnson give Crain the amount actually estimated by Milius. Crain believed and relied upon the statements of Johnson, there being nothing in Johnson's conduct to arouse any suspicions on his part. Further, Johnson did not tell Crain that the cruise was based upon the instruc-

tions to Milius that he consider only such timber as would "render a net profit to the type of sawmill Mr. Johnson was planning to operate, which would be considered merchantable to him [Johnson]." Crain assumed, as he had the right to assume, that the cruise covered all "merchantable timber," as that term is generally understood in the industry, not just the timber that would render a net profit to Johnson in his proposed operations.

After considerable discussion about the price to be paid for the timber on tract (a) the parties finally arrived at a lump sum of $8,000. From the evidence it is clear this sum was arrived at by assuming two million board feet as the amount and $4 per thousand feet board measure as the price.

In addition to the timber on tract (a) there was some scattered timber on other portions of defendants' lands. This latter timber was located nearer to the base of defendants' ranch operations than that on tract (a). It was not cruised. This is the timber described as being on tract (b) in the contract of sale. Neither party had any idea as to the total amount of merchantable timber on tract (b). The agreement for its sale and purchase was reached at the same time arrangements were made for the sale and purchase of the timber on tract (a).

Following this meeting of the minds, Johnson had his own attorney prepare the form of contract and sent it by mail to defendants for execution by them. In transmitting the form of contract, Johnson wrote: "I am sending you this unsigned copy so that if there are any omissions or corrections you may notify us at Redmond."

Under the circumstances outlined above, defendants were induced to and did execute the contract and were

paid the sum of $8,000 as therein provided. They acted in good faith and in reliance upon the information given them by Johnson.

In September, 1948, defendants ascertained that a cruise of the timber on their lands, as well as upon adjacent lands, was being made by the Edward Hines Lumber Company pursuant to negotiations for the sale thereof by Johnson and his associates to that company. Matters connected with this discovery aroused their suspicions as to the actual amount of merchantable timber on tract (a). The so-called Hines cruise was a joint cruise and, when completed, disclosed three million one hundred seventy-three thousand board feet of merchantable timber on that tract.

About the time this Hines cruise was finished, Johnson was in communication with defendants respecting the removal of encumbrances against their lands so that good title might be given the Hines Lumber Company. Their suspicions having been aroused, defendants had made a request of the Hines Lumber Company for the figures on the Hines cruise. Before this information was furnished to defendants, but after the cruise had been made and the result thereof known to Johnson, Johnson was asked by the defendants what that cruise disclosed. Defendant Crain testified that Johnson said, *"the cruise was just about like the Johnson cruise, about 2 million feet."* (Italics ours.) Johnson admitted giving this false information and sought to justify it by asserting, in substance, that he didn't think it was any business of defendants what that cruise revealed.

Immediately after receiving the cruise figures from the Hines Lumber Company, defendants notified Johnson that they would not go through with their contract. On October 25, 1948, and by letter, defend-

ants' attorney notified plaintiffs, through their attorneys, De Armond, Goodrich & Foley, that they were rescinding the contract, and on November 19, 1948, they caused the following letter, with enclosure, to be mailed by their attorney:

"November 19, 1948

"Snow Mountain Lumber Co.
c/o Sam S. Johnson
Redmond, Oregon

"Gentlemen:

"I enclose herewith Cashier's Check for $8,-250.00 endorsed to you by E. W. and Bernice Crain.

"This check is given to you by Mr. and Mrs. Crain to reimburse you for all monies paid to them as a result of a timber sale contract dated August 1, 1946 and which they have rescinded for the reasons stated in my letter to the firm of De Armond, Goodrich and Foley of October 25, 1948.

"Should you see fit to retain the check will you kindly surrender your copy of the contract by mailing it to me.

"Very truly yours,
(Sgd.) Pat H. Donegan"

Plaintiffs did not accept the check and commenced this suit.

■■ Ordinarily a purchaser is not required to disclose to the seller facts, within his knowledge, which materially affect the value of the property. However, this rule has its exceptions. In 55 CJ, Sales, 154, § 112, the following is stated:

"Where, however, the buyer by some artifice or trick, such as by a misstatement or partial statement accompanied by a suppression of material facts, puts the seller under a misleading impression as to the true facts concerning the property his nondisclosure amounts to active concealment and constitutes fraud. It may also constitute fraud

for the buyer to fail to disclose facts where there are special circumstances which call for a disclosure, as where he stands in a relation of trust and confidence to the seller, or where after he has made an innocent misrepresentation, he discovers the truth, but permits the seller to act on the misrepresentation in consummating the sale."

See also 55 Am Jur, Vendor and Purchaser, 563, § 88.

■ At the outset, Johnson was under no obligation to have the timber cruised for the benefit of defendants. If they wanted it cruised, it was incumbent upon them to have it done. Johnson might have made his own cruise for his own information and been under no duty to disclose the result to the Crains. But when Johnson undertook to secure a cruiser to make the cruise for both himself and defendants, an entirely different situation was presented. From then on, with respect to that matter, he was acting not only for himself, but also as agent for defendants. It is elementary that, as an agent, he owed the utmost good faith to his principals. When the cruise was completed, he owed to defendants the positive duty of full disclosure regarding the same. He was under obligation not only to give them the exact figures of the Milius cruise, but also to explain to them the type of cruise that was made and, in particular, the basis upon which it had been made; that is, that it took into consideration only such timber as might return a net profit to himself in his operations. These were material facts. It is reasonable to assume that, had defendants been informed of these facts, they would have rejected the cruise and arranged for another and more accurate examination. The cruise actually made by Milius, and as reported to Johnson, lacked much of being detailed and thorough; he spent but five hours upon the job

that Johnson had represented to defendants would require three days.

■ Though a buyer is not bound to answer a seller's inquiries relative to the property being purchased and sold, in the absence of special circumstances, yet if he does answer, he must answer truthfully. 55 CJ, Sales, 153, § 112; 55 Am Jur, Vendor and Purchaser, 563, § 88. He must make a full and fair disclosure and not conceal pertinent or material information. The rules are the same whether the sale is of real or personal property. In 55 Am Jur, Vendor and Purchaser, 564, § 88, it is stated:

> "And so, if the vendor, being unacquainted with the land, inquires of the vendee what the land is worth or makes inquiry concerning some particular matter bearing upon its value, it becomes the purchaser's duty to speak the truth, if he undertakes to speak at all; in such cases a concealment or suppression of the truth, where coupled with any actual misrepresentation or overreaching, however slight, may be sufficient to entitle the vendor to have the deed set aside, the circumstances amounting to fraud or deceit. Fraud may be predicated upon an equivocal, evasive, or misleading answer calculated to convey a false impression even though it may be literally true as far as it goes. A partial and fragmentary disclosure accompanied by wilful concealment of material and qualifying facts is not a true statement and is often as much a fraud as an actual representation."

The foregoing principles are of general application, and to apply them it is not necessary to establish a confidential relationship. Wholly apart from the question of agency, Johnson, having undertaken to speak, was required to make a complete disclosure. *Palmiter v. Hackett,* 95 Or 12, 17, 185 P 1105, 186 P 581.

If, in fact, there was substantially more "merchant-

able timber" on the tract in question than represented by Johnson, then Johnson misled and deceived the defendants to their injury.

It must be kept in mind that the parties were dealing with "merchantable timber." It is so described in the contract entered into between them. At no time during their negotiations did Johnson even intimate to defendants that he considered as "merchantable timber" only that which would return to him a net profit in the type of operation which he claims he had in mind. We know of no authority, nor has any been cited to us, that defines "merchantable timber" to be only such as that contained in the instructions given Milius.

■ It may be conceded that there is no definition of "merchantable timber" which will fit all occasions and all localities. Although a term very frequently used in timber sales contracts, as it was used in the contract here, nevertheless, it is one having no definite and fixed meaning. What may be "merchantable timber" at one time or place may not be deemed such at another time or place. In determining what is covered by the term at a particular time and in a particular locality many factors are considered. Size and quality are of prime importance. Location, accessibility, demand, and market conditions are regarded. We do not assume to enumerate all the elements involved in the term. However, for the purposes of this case, we adopt the same definition adopted by Mr. Justice Hay in *Monger et ux. v. Dimmick et al.*, 187 Or 253, 257, 210 P2d 929; to-wit:

"* * * 'all merchantable timber,' as those words are used in the contract under consideration, is all timber—whatever its size—that had, at the date of the contract, *or may have during the life of the*

*contract,* a commercial value in that locality, for the purpose of manufacture into lumber, *or for any other purpose."* (Italics ours.)

Despite the allegations of their complaint that the tract in question contained three million one hundred sixty thousand board feet of merchantable pine timber, plaintiffs sought by the testimony of expert witnesses to discount those figures. It is unnecessary for us to pass upon the competency of this evidence, because, giving it due consideration, it fails to satisfactorily explain the discrepancy between the Milius cruise and that of the Hines Lumber Company. We are impressed by the testimony of Bert W. Udell, an expert witness called by defendants. Udell, a graduate of Oregon State College of the class of 1940, holds a degree from that school in logging engineering. He has specialized in logging engineering and cruising of all kinds. He has cruised Ponderosa pine timber in the Burns area. Before testifying, he had spent five or six hours looking over the timber involved here. In contradiction to the testimony offered by plaintiffs that the place where timber is to be milled and the size and efficiency of the sawmill which is cutting it are determining factors in the estimate of the number of board feet of merchantable timber on a given tract of land, Udell testified:

"Q Can you tell me whether or not in cruising timber the place where the timber is to be milled or the size or efficiency of the sawmill, which is cutting it, has any effect upon the estimate?

"A No, a cruise is an estimation of the volume. The economically, practicability of the tract of timber is determined otherwise, that is a matter of economics.

"Q Can you tell me whether there would be any change in cruising pine timber upon the basis of

the economic conditions, if it were cruised in 1946 rather than 1948, or vice versa?

"A No, there should be no change."

In 1946 there was a market and a demand for defendants' timber, as well as for other timber of like kind in that locality. This is conclusively demonstrated by plaintiffs' own activities in buying up large stands of timber, to say nothing of the actions of others such as Ammons. The fact that a large mill like that of Hines Lumber Company would utilize more of the tree than would a medium-sized sawmill, cannot account for the great difference between the 1946 and 1948 cruises. It is unreasonable to suppose that there would be a wastage of approximately one-third of the timber if milled in a medium-sized sawmill. Aside from an increase in demand and price for timber after the removal of federal price regulations in November, 1946, there was little, if any, change in conditions between August 1, 1946, and September, 1948, that affected a determination of what constituted "merchantable timber" in the territory where this timber is located. It is crystal clear to us that the Hines Lumber Company would have used substantially the same portions of the tree in 1946 as it was ready to purchase and use in 1948; that is to say, in 1946 there would have been no more wastage than in 1948; the timber would have been utilized to the fullest extent.

We are convinced that, under the instructions given him by Johnson, Milius did not include in his estimate all the "merchantable timber," as that term has been defined herein, far from it. Perhaps the instructions he received account for the extremely hasty and incomplete cruise which he made. In the light of Johnson's knowledge and experience in the field of timber, we are satisfied that he knew there was a

substantially greater amount of merchantable timber on the tract than he represented to defendants.

Taking into consideration the testimony of plaintiffs' experts called for the purpose of explaining the very substantial discrepancy between the Milius cruise and that of Hines Lumber Company, as well as that of the experts called as witnesses by defendants, and making due allowance for honest variations in estimates between skilled cruisers on the same tract of timber and for changed conditions between August 1, 1946 and September, 1948, we believe it fair to say that on August 1, 1946, there was in excess of two and one-half million board feet of merchantable timber on tract (a); at least, there was a substantially greater quantity than that represented to defendants by Johnson. We reject entirely, as a basis for estimating the amount of merchantable timber on a given tract of land, the standard set by Johnson in his instructions to Milius.

■ It is argued by plaintiffs that it is necessary to a right of rescission on the ground of fraud that each of the elements of  actionable fraud be proved with reasonable certainty, and all of them must be found to exist. This court has, in many decisions, set forth the essential elements of actionable fraud, and it is unnecessary to repeat them here. However, plaintiffs are mistaken in their contention as respects the right to rescind a contract on the ground of fraudulent conduct; it is not necessary to establish all the elements of actionable fraud. The rule is stated in *Sharkey v. Burlingame Co.*, 131 Or 185, 197, 282 P 546, 550, as follows:

"Rescission is often granted in cases where an action for deceit could not be maintained. The *right of rescission does not,* as the right to recover

damages in a common-law action for deceit, *depend upon fraud*, for if the transaction was the result of a false representation of a material fact it cannot stand against the injured party's right to rescind, however honestly made.'' (Italics ours.)

For the purposes of this case it might be conceded that the false representation made by Johnson respecting the quantity of timber in tract (a) was innocently made, also, that he had no wrongful intent or purpose in withholding a full disclosure of the facts relative to the Milius cruise; yet the result would be the same. These matters related to material facts, and defendants relied upon them. When defendants discovered the truth after the Hines cruise, they had the right to rescind the transaction; provided they act promptly, which they did.

■ In *Weiss v. Gumbert*, 191 Or 119, 227 P2d 812, 819, this court quoted with approval from Restatement, Contracts, 908, § 476, as follows:

"(1) Where a party is induced to enter into a transaction with another party that he was under no duty to enter into by means of the latter's fraud or *material misrepresentation*, the transaction is voidable as against the latter and all who stand in no better position * * *.

"* * * * * *

"In comment b. on the foregoing statement we find: 'b. *Innocent material misrepresentation though not accompanied by negligence has the same effect as fraud in rendering a contract or discharge voidable.'* ''

In view of the principles of law heretofore stated, the trial court erred in decreeing specific performance. Under all the facts and circumstances of this case and, in particular, Johnson's own testimony, defendants

were entitled to a decree cancelling, setting aside, and holding for naught the contract in question. Plaintiffs are entitled to the money tendered into court with defendants' answer.

The decree of the trial court is reversed and this cause remanded with directions to enter decree in accordance with this opinion.

Defendants are entitled to costs.