John N. SEAVER, Jr., Appellant,

v.

UNITED STATES PLYWOOD CORPO-
RATION, Appellee.

No. 16357.

United States Court of Appeals
Ninth Circuit.

Dec. 8, 1959.

As Amended Dec. 21, 1959.

Koerner, Young, McColloch & Dezen-
dorf, James C. Dezendorf, Joseph Larkin,
Portland, Or., Bailey, Hoffman & Spen-
cer, Lewis Hoffman, Eugene, Or., for
appellant.

Hart, Rockwood, Davies, Biggs & Strayer, Hugh L. Biggs, Cleveland C. Cory, Robert H. Huntington, Portland, Or., Husband & Johnson, Eugene, Or., for appellee.

Before STEPHENS, POPE and MAGRUDER, Circuit Judges.

POPE, Circuit Judge.

In this action by appellant-plaintiff, a citizen of Oregon, against the appellee-defendant, a New York corporation, it was alleged that defendant had intentionally trespassed upon certain lands of plaintiff and wilfully cut and removed timber belonging to him. The prayer was for judgment for three times the damages suffered by the plaintiff. Upon the trial the court determined that the defendant owned all of the timber which it cut upon plaintiff's land with the exception of five cedar trees. It awarded the plaintiff damages in the sum of $80, being double the value of the five cedar trees, and denied all other relief. Plaintiff has appealed.

The land now owned by the plaintiff was on May 4, 1942, owned by one Warlick and his wife. On that day the Warlicks entered into a written agreement with Siuslaw Forest Products, Inc., here called Siuslaw, by the terms of which the Warlicks agreed to sell to Siuslaw "all of the merchantable old growth and second growth fir and hemlock timber either standing or down and now growing or located upon the following described real property". Siuslaw agreed to purchase and remove the timber and it was stipulated that Siuslaw "shall have twenty years from the date hereof within which to commence the cutting and removal of said timber and such additional time as may be reasonably necessary not to exceed five years to complete the cutting

and removal of the timber sold and purchased hereunder." The total purchase price was $7000 payable $2000 down and the balance in annual installments of not less than $1000 each year thereafter until paid in full. Siuslaw was to pay all taxes or other assessments levied against the timber (exclusive of the land) throughout the life of the agreement and "until the timber purchased and sold hereunder shall have been cut and removed or the same abandoned by the vendee."

In October, 1942, the Warlicks conveyed to G. E. Tucker and wife and S. W. Tucker and wife, the real property described in the contract except for the timber heretofore sold by the Warlicks under the contract mentioned; and in July, 1952, the Tuckers entered into a contract with plaintiff whereby the latter agreed to buy all of their interest in the land. Subsequently the Tuckers conveyed the real property subject to the exceptions mentioned to Seaver.[1] On May 1, 1953, the defendant acquired all of the assets and assumed all of the liabilities of Siuslaw. In 1949 Siuslaw began logging operations on the property described in the contract, and from that date to and including the year 1955, first Siuslaw, and then its successor, the defendant, cut and removed from that property 11,485,000 board feet of timber. Of this total 4,156,000 board feet were second growth Douglas fir. Eight thousand board feet represented the five cedar trees previously mentioned. Of the second growth fir 3,125,000 board feet was removed between January 1, 1953 and December 30, 1955, which means that the greater portion thereof was removed during that latter period.[2]

The main theory upon which the plaintiff's action proceeded in the court below was that although the contract between

---

1. After this suit was commenced, but seven days before the amended complaint was filed, the Tuckers executed an instrument assigning to Seaver "all their right, title and interest in and to any and all claims the said assignors might have or in the past have had" against Siuslaw or United States Plywood Corporation.

2. It was stipulated that 591 thousand board feet of hemlock timber was removed from 1949 to 1955 inclusive, of which 431 thousand was removed between January 1, 1953 and December 31, 1955. There is no showing as to what part of these amounts was second growth hemlock.

the Warlicks and Siuslaw provided for the sale to the latter of "all of the merchantable old growth and second growth fir and hemlock timber", upon the described property, under the settled Oregon rule this must be taken to include only that timber which was merchantable on the date of the contract, namely, May 4, 1942. It was the plaintiff's position that at that date none of the second growth timber on that land was then merchantable.

The plaintiff also took the position that some of the old growth timber was not merchantable, although how much of this old growth was in that category was not established. The principal contention therefore was that to the extent that defendant or its predecessor had cut second growth timber from the land, a trespass had been committed for which the plaintiff was entitled to recover three times the amount of his damages as provided by an Oregon statute, ORS § 105.810.

In rendering judgment for the defendant (except for the value of the five cedar trees), the court found as a fact that all of the fir and hemlock timber removed by defendant and Suislaw was in fact merchantable.

Upon this appeal the appellant makes two principal contentions. The first is that there was no competent evidence in the record or before the court to warrant the court's finding that the timber cut was thus merchantable; and second, that by reason of the filing of certain affidavits in the assessor's office stating that all timber had been cut on certain of these lands, the defendant had in any event abandoned any further interest in the timber, in consequence of which all timber cut thereafter had been taken unlawfully and without right.

Much of the controversy between the parties concerns the meaning of the words "all of the merchantable old growth and second growth fir and hemlock timber," used in the contract. Apparently there is no dispute as to the proposition that "merchantable timber" as used in the contract, included only timber of the named species that was merchantable on the date of the contract. The key finding of the court assumes this for it states that the fir and hemlock removed by defendant and Siuslaw was in fact merchantable "on May 4, 1942". The Oregon Supreme Court, resolving, in its words, "conflict * * * in the decisions of this court", has held that "a grant of merchantable timber is a grant only of the merchantable timber on the land at the date of the contract." Doherty v. Harris Pine Mills, Inc., 211 Or. 378, 315 P.2d 566, 585–588, approving and quoting from Hughes v. Heppner Lumber Co., 205 Or. 11, 15, 283 P.2d 142, 144, 286 P.2d 126, and Rayburn v. Crawford, 187 Or. 386, 398, 211 P.2d 483. It seems equally clear that in the view of the Oregon court, timber may be "merchantable" although it does not appear that it can be utilized at a profit. Dahl v. Crain, 193 Or. 207, 237 P.2d 939.[3] According to that court, all that is required is that it had commercial value,—"merchantable timber is ' "all timber * * * that had * * * a commercial value in that locality".' " Hughes v. Heppner Lumber Co., on rehearing, 205 Or. 11, 286 P.2d 126, 127.[4]

3. That was a suit for specific performance of a contract to sell merchantable timber for a stated sum. In negotiating the sale, the defendant relied on a cruise of the timber by one Milius arranged for by plaintiff's predecessor. The latter, without defendant's knowledge, instructed the cruiser to disregard "any amount of timber which would not turn into a net profit." The court held that failure to inform defendant of these conditions attached to the cruise was such concealment as made the contract unenforcible. The court said: "We know of no authority, nor has any been cited to us, that defines 'merchantable timber' to be only such as that contained in the instructions given Milius." 237 P.2d at page 947.

4. Although portions of appellant's brief indicate that he is contending for a more restrictive view of what is required to make timber merchantable, yet he tried his case on the theory that the definition just quoted is correct. Thus, in questioning his witnesses he proceeded as follows: "Q. Mr. Jones, in answering my following questions will you please ac-

It is appellant's position that the meaning of "merchantable timber" is something fixed by Oregon law. He says: "Under the law of Oregon the words 'merchantable timber' are not ambiguous. They have a well-understood meaning of 'timber which has a commercial value' considering all the facts and surrounding circumstances." Appellee, on the other hand, asserts that "merchantable timber" is a term which has no definite or fixed meaning. It argues that in this sense the contract was ambiguous and hence extrinsic evidence of the intention of the parties was admissible for the purpose of showing that the contract was designed to pass to Siuslaw all of the fir and hemlock timber, both old growth and second growth, then standing upon the land. Davidson, the manager of Siuslaw, who negotiated the contract on its behalf, his assistant, Gonyea, who sat in on the discussions with Warlick, and Warlick himself, all testified. Appellee asserts that a fair interpretation of their testimony discloses that the intent was that, aside from the cedar, Siuslaw was to get all of the timber, including all of the fir and hemlock, whether old or second growth.

For reasons hereafter appearing, and because we are satisfied that the trial court's decision was not based upon that ground, we think it unnecessary here to inquire whether the contract was in the respect claimed, ambiguous. This determination saves us the necessity of examining certain Oregon decisions which seem to lend some color to this position of appellee as to ambiguity.[5] We assume that the words used in the contract referring to "merchantable old growth and second growth fir and hemlock timber" in the words of appellant's brief, had "a well-understood meaning of 'timber which has a commercial value' considering all the facts and surrounding circumstances."

■ What appellant must demonstrate here is that there is no evidence in the record to sustain a finding that the second growth timber had commercial value. By his own standard, if it had commercial value, the finding that it was merchantable timber on May 4, 1942, cannot be said to be erroneous. That brings us to a discussion of the evidence.

Appellant called witnesses, offered as experts, who testified that in their opinions the second growth timber on this land was not merchantable in 1942.[6]

cept this definition of merchantable timber: Merchantable timber is that timber which has commercial value, taking into account its size, quality, location, accessibility, demand and market conditions?" In his brief appellant says: "Under Oregon law, only timber which has a commercial value *and which can be utilized at a profit* is in fact 'merchantable'." We find difficulty in squaring the words we have emphasized with the language used in Dahl v. Crain, supra, note 3.

5. "The conclusion to be drawn from these cases is that the term 'merchantable timber' in and of itself involves some ambiguity requiring a consideration of the surrounding circumstances and the 'attitude toward the subject-matter subsequent to the execution of the contract,' i. e., the practical construction placed upon the contract by the parties." Doherty v. Harris Pine Mills, 315 P.2d 576.

6. Witness Jones' knowledge of the Seaver land was based on a cruise of the stumps made jointly with one Sanders about

1958. Jones first came to the area in 1941 but it did not appear that he had seen the land before the timber was cut. He disclaimed being an expert on the market for second-growth timber in Lane County in 1942. "I wouldn't * * say I was an expert on timber in 1942, in Lane County. I had only been here a year." According to this witness, in 1942, the only merchantable timber would be the old-growth timber.

Witness Buss, who expressed the same opinion, had known the Warlick property since 1923. He had logged and bought timber in that general area. He agreed that it was his thinking that "nothing is merchantable that is not profitable." Because the road into the tract in 1942 was not suitable for hauling logs, he thought the cost of a road in would make this timber not profitable, and hence not merchantable. He testified on cross-examination:

"A. For that one strip of timber alone it wouldn't be merchantable. It would be impossible to get it out. * * *

On behalf of the appellee, a number of witnesses testified as to actual use of second growth fir timber for manufacture into lumber, poles and piling in 1942 and the year immediately preceding, all in Lane County, or the Mapleton area where the Warlick property was situated. Thus Siuslaw itself was logging second growth timber in the vicinity in 1941. There was a market for hemlock for use for pulp logs. There was testimony that in 1942 second growth timber in the area was being used to manufacture dimension lumber, bridge planks, car decking and railroad ties. There was testimony that beginning in 1942, when the armed forces began lumber purchases, the demand and the market for all lumber and wood products strengthened. One witness was able to name a half dozen mills operating in the county which used substantially nothing but second-growth timber.

Appellant discounts this testimony stating that the second growth fir timber being cut and manufactured in the years 1940, 1941, 1942 and thereabouts was located on good roads and in areas where it was readily accessible. He notes that in 1942 the Warlick property and timber was remote and inaccessible; no logging road had been built on that tract; it was reached over a winding 20 mile road unsuitable for hauling logs.[7] Hence says appellant, evidence of active or successful cutting of second growth timber near mills or logging roads, "does not constitute a scintilla of evidence" to show that the Warlick timber was merchantable.

But there are other circumstances which were properly taken into consideration by the trial court. If the trial court was here considering, as we have suggested it should, whether the timber in question had a commercial value at the time of the contract it could hardly disregard the obvious fact that on May 4, 1942, second growth timber on the Warlick tract was actually sold and Siuslaw agreed to buy and pay for it.

Of course there is nothing in the contract to disclose what the thinking of the parties to the contract was as to how much of the total consideration stipulated represented the price of second growth timber as distinguished from that of old growth timber. Under the theory upon which we are now proceeding, parol evidence on that point would be inadmissible; but certainly the conclusion is inevitable that the parties did agree to sell and buy second growth timber and something was paid for it. This alone is some evidence that on the date of the contract second growth timber had commercial value. In considering this point, the trial court said in an oral opinion at the conclusion of the trial: "If no second-growth timber is merchantable, why in the world would the parties have inserted a statement in the contract that they were selling second-growth timber? This is not a case of two people who didn't know the business. On one side we had Mr. Davidson representing the company, and on the other side Mr. Warlick. I don't think that either of them, particularly Mr. Davidson, would have put in a useless phrase 'merchantable second-growth' if there wasn't any merchantable second-growth."

There was some evidence produced by the defendant as to what timber Warlick, who sold, and Davidson, manager for Siuslaw, who negotiated the contract for it, intended should pass under the contract. Because as previously noted we have adopted the view here that the contract was not ambiguous it is clear that that testimony must be disregarded because of the parol evidence

"Q. If you had millions of feet in that area, then, you are not prepared to say it wouldn't justify the construction of a road in the area, are you? A. If you had enough other timber, it might. "Q. How much other timber would you need? A. I don't know."

7. This fact the court specifically found in its Finding XV as follows: "The Seaver tract in 1942 was inaccessible for immediate logging in that it was located in a rugged and rough area into which no logging roads had been constructed."

doctrine and the rule of integration. But that rule does not mean that the court cannot look to the surrounding circumstances and the situation of the parties in order to interpret the meaning and effect of the contract. This is well put by Prof. McCormick, (Handbook of the Law of Evidence, p. 442, 1954), who, after stating the parol evidence rule, proceeds: "But written instruments are not self-sufficient and automatic mandates which the courts can always enforce merely by inspecting the instrument, and stamping it with a judicial fiat. Written words can be translated into appropriate action by the court only through the process of ascertaining what the words stand for in the way of particular conduct or particular tangible objects." He further states: "In the first place, no writing which is to be the basis of judicial action can be considered only in the abstract. Evidence of the surrounding circumstances must be resorted to, in order to identify the subject-matter and the persons referred to in the writing and to reveal the relations of the parties and the situation from which the transaction arose." and concludes: "Whenever a writing is found to require interpretation, the relevant background facts, such as those bearing on the nature and condition of the property involved, the relations of the parties, and the surrounding circumstances generally, may be freely shown so that the court, in ascertaining their intentions, may place itself in the shoes of the parties."[8] It seems quite obvious that the trial court here was obliged, in order to arrive at a determination as to whether this timber on May 4, 1942 had "commercial value" to consider the nature and condition of the property and the sourrounding circumstances generally, so as to place itself in the shoes of the parties.

In Oregon the parol evidence rule is stated in statutes which recognized the distinction between attempts to alter the terms of an agreement by prior or contemporaneous oral negotiations between the parties, and proper consideration of the circumstances under which a contract was made in the course of interpreting it. The parol evidence rule proper is set forth in ORS § 41.740 where, after stating that no evidence of the terms of an agreement other than the contents of the writing may be received, proceeds: "However this section does not exclude other evidence of the circumstances under which the agreement was made, or to which it relates, as defined in ORS 42.220. * * *"[9] § 42.220, there referred to reads as follows: "§ 42.220 Consideration of circumstances. In construing an instrument, the circumstances under which it was made, including the situation of the subject and of the parties, may be shown so that the judge is placed in the position of those whose language he is interpreting." Referring to this section, the Supreme Court of Oregon has said: "This permits the judge to consider circumstances under which the instrument was executed and the relative situations of the parties." United States National Bank of Portland v. Guiss, 214 Or. 563, 331 P.2d 865, 879.

8. The propositions thus stated by McCormick are discussed at great length by Mr. Wigmore (Wigmore on Evidence, 3d ed.) in §§ 2458 to 2470, inclusive. In the last numbered section, Volume IX, p. 227, he says: "The truth had finally to be recognized that words *always* need interpretation; that the process of interpretation inherently and invariably means the ascertainment of the association between words and external objects; and that this makes inevitable a free resort to extrinsic matters for applying and enforcing the document. 'Words *must* be translated into things and facts.' Instead of the fallacious notion that 'there should be interpretation only when it is needed', the fact is that there must always be interpretation."

9. This sentence, in full, is as follows: "However this section does not exclude other evidence of the circumstances under which the agreement was made, or to which it relates, as defined in ORS 42.-220, *or* to explain an ambiguity, intrinsic or extrinsic, *or* to establish illegality or fraud." (Emphasis added.)

Among the circumstances surrounding the execution of the 1942 contract was the fact that Siuslaw had then acquired or was in the process of acquiring large quantities of timber or timber lands adjoining and adjacent to the Warlick property. Some of the Warlick property was surrounded on three sides by the other timberlands acquired by Siuslaw. In the normal logging of the entire area the timber on the Warlick land could readily be removed by operations which embraced both that timber and the timber otherwise acquired by Siuslaw. While Siuslaw's logging road into the other timber had in 1942 not yet been completed to the boundary of the Warlick property, Exhibit 53 shows that it had reached the North boundary of section 30, proceeding from the North, and that the Warlick boundary extended to the North half of section 31 lying immediately to the South.[10] It is plain why Siuslaw wanted the Warlick timber. It served to fill out and round out its timber holdings in an area in which it planned to operate over a period of years. It would appear obvious that this adjacent area would be available to Siuslaw in supplying it with a backlog of timber to supply its mill then being completed at the nearby town of Mapleton where it had begun to manufacture lumber from its timber stands. While Siuslaw was not a sufficiently large outfit to be on a sustained-yield program with its own holdings, yet it was establishing a long range program described by the witness Gonyea who sat in on some of the negotiations for the Warlick timber and who was a son of the president of the company who signed the contract. He said: "Well, we were buying timber whenever we could find it in as large quantities as we could procure, with the knowledge that it would be a long-time operation, be considerable time before we would use it up and, as a result, contemplated the first demand for the building of a sawmill. And as we continued on we would have undoubtedly been a plywood plant, too. But we had a program in mind of establishing an integrated lumber industry there for a long-range operation."

We think that this sufficiently discloses why Siuslaw bargained for the second-growth timber and paid money for it. Certainly the trial judge was warranted in finding that under the circumstances then present this second-growth timber on the Warlick land had commercial value at that time and place. It had commercial value because there was a ready purchaser which needed it for its long-range program;—a purchaser which in the ordinary course of future operations would necessarily continue its road construction to the Warlick land and on beyond it to other tracts which it acquired.[11] The contract itself is good evidence of this, for it gave Siuslaw a total of 25 years in which to take off the timber.

Counsel for the appellant in questioning his witnesses as to whether the timber was merchantable defined that term as follows (see footnote 4, supra): "Merchantable timber is that timber which has commercial value, taking into account its size, quality, location, accessibility, demand and market conditions." It seems plain that the trial court was justified by the proven circumstances in disagreeing with the testimony given by appellant's witnesses that second-growth was not merchantable for there was plainly evidence that the demand and market conditions which arose from the location of the timber in relation to the

10. When the road finally reached the Warlick tract in the fall of 1949, it had required some 3 or 4 miles of road to get there because of the rough character of the terrain.

11. A comparable situation would be that of a man who owned a strip of land three feet wide lying between two large downtown city lots. Ordinarily such a man might despair of finding a purchaser for a three foot wide lot. But if it developed that Mr. Hilton or Mr. Sheraton owned the two lots and desired to construct a hotel utilizing both lots, the three foot strip in beween might become well-nigh priceless. At any rate, there could then be no doubt of its commercial value.

holdings of Siuslaw were such as to give this timber commercial value. After all the problem was not so much what is meant by "merchantable timber" as whether under the circumstances the timber in question was salable,—whether it had commercial value. As stated by the Supreme Court of Oregon in the case of Dahl v. Crain, 237 P.2d at page 947: "What may be 'merchantable timber' at one time or place may not be deemed such at another time or place. In determining what is covered by the term at a particular time and in a particular locality many factors are considered. Size and quality are of prime importance. Location, accessibility, demand, and market conditions are regarded. We do not assume to enumerate all the elements involved in the term."

When we break down into its elements this definition of merchantable timber employed by plaintiff in examining his witnesses, we find that the only apparent difference between this stand and those being cut by the operations testified to by defendant's witnesses, was that one factor was initially missing—the factor of accessibility. Had this Warlick timber been readily accessible, it should compete successfully with the other stands referred to. But the feature of this contract which offset the lack of accessibility was the provision granting 25 years for its removal. The conditions which surrounded the contract when made included the circumstance that in regular order, and in the course of its other operations, Siuslaw would extend its road to the Warlick land. The long time granted fitted into that situation and made it inevitable that before the 25 years had expired the problem of inaccessibility would have been cured. The Siuslaw plan for long operation, plus the provision for 25 years for removal, gave the stand of second-growth timber commercial value.[12]

The appellant presents a second alternative argument to the effect that in any event some 3,125,000 of the second-growth timber that was cut by defendant or Siuslaw between January 1, 1953 and December 30, 1955, was logged and

---

12. Of course the use of the word "merchantable" in the contract implies some restrictions or limitations on the timber that may be taken. It would not include saplings or trees suitable only for firewood or Christmas trees. As previously noted, appellant tried his case on the theory that *none* of the second-growth timber was merchantable. For the reasons previously stated here, that position may not be taken. Assuredly *some* second growth timber was purchased, as the language of the contract shows. Appellant cannot take the position that he wants damages because defendant cut *too much* second-growth timber, for example, timber too small in size to be deemed properly merchantable. He cannot do that for his case furnishes no proof as to which portion of the cut of second growth he asserts was unauthorized. What proof there is negatives any possible claim that some part of the second growth timber taken was so small that it could not have been merchantable on May 4, 1942. After all cutting had terminated, Sanders, a consulting forester, with Jones, (see footnote 6, supra), made a joint stump cruise of these lands. The results are tabulated on exhibits which show that the stump diameters of second-growth timber cut ranged from 14 inches to 48 inches; that the fir trees, as small as 14 inches, were only 1.8% of the trees taken and 0.3% of the net volume. Hemlock of this size was only 0.5% of net volume. The greatest percentage of trees and volume of the fir cut, was 30 inch stump diameter; in the case of hemlock, 26 inches.

The stump cruise showed that a tree cut in 1951 with 14 inch diameter would have had a diameter of 13.32 inches ten years previously. One of the 30 inches diameter in 1951 would be 27.68 inches ten years previously. The relative figure for a 26 inch tree would be 23.98 inches ten years previously. There is nothing to show that a second-growth tree of 13.32 inch diameter in 1942 would not be merchantable. A large number of photographs of the land in question, taken about a month prior to the trial, were put in evidence. They show large quantities of second growth timber, generally below the size shown by the stump survey, were left standing. There is complete lack of proof that defendant took too much or too small sizes of the second-growth timber it bargained for.

removed after Siuslaw had abandoned this timber and released its interest therein. This contention is based upon the fact that in January, 1950, and again in January, 1951, one Frank M. McPherson, an employee of Siuslaw, who kept some of its records of timber cutting and timber depletion, filed in the office of the Lane County assessor affidavits of timber removal showing timber removed from certain portions of the Warlick property. The affidavit showed the subdivisions logged and in each case indicated that no timber remained. The Warlick tract included substantially more than half of Section 31 Township 18 South Range 9 West, approximately one fourth of Section 6 of the next township to the South, and a small area of approximately 80 acres in Section 1 of the township lying immediately West of the township containing Section 6. The affidavit of January, 1950, showed completion of logging on a small portion of the Warlick land in Section 31. The two affidavits of January 9, 1951, showed a completion of logging on the Warlick lands in Section 6 and the remainder of the lands of Section 31.

After these affidavits had been filed, the assessor returned them to Siuslaw for the attention of McPherson requesting that he be given the number of acres of timber estimated on each tract as the figures in the affidavit did not correspond with the amounts which the assessor had. McPherson replied, stating: "All timber has been removed from the reported lands."

In presenting these circumstances, particularly the filing of the affidavits, as constituting abandonment of the timber then remaining, appellant relies upon the case of Hughes v. Heppner Lumber Co., supra, in which it appears that similar affidavits had been filed by the officers of the Heppner Lumber Co. Apparently it is the appellant's view that it is Oregon law that the filing of such affidavits amounts to an abandonment of timber. The trial court disagreed with this contention. Upon the legal proposition the trial judge stated: "I do not read Hughes v. Heppner to require a finding of abandonment, even if a false affidavit has been filed in the face of clear and convincing evidence to the contrary." As we usually do in such cases, we are much inclined to respect the trial court's view of the law of his own state.[13]

The trial court further found that there was no relinquishment or abandonment of any of the rights of Siuslaw or of the defendant in the timber. It found that when McPherson filed the affidavits they were intended to reflect the status of the initial timber inventory in Siuslaw's records, which inventory was not based upon any accurate information, but was an estimate of timber holdings. The court found that when McPherson filed the affidavits he was unaware of large tracts of remaining timber located in ravines and on the ridge slopes. The evidence shows also that after the filing of the affidavits Siuslaw continued to pay taxes on the timber. Thus, in June, 1951, when Tucker was owner of the Warlick land, Siuslaw under date of June 21, 1951, sent Tucker a check for $217.-25 "to repay you for the forest patrol tax on certain lands in Lane County on which we have timber cutting rights. Per our contract it is our obligation to pay this tax." Similar remittances were made to Seaver on April 22, 1953, April 13, 1954, January 10, 1955 and January 18, 1956. No one was misled by the filing of the affidavits, for the continuing assessment roll of taxable real property in the county

13. We think that case turned not upon any automatic effect of filing such affidavits but upon the court's determination that the defendant's right to remove the timber involved in that case had come to an end because, in the words of the court, "in our opinion a reasonable time had elapsed for its removal." As we understand that case, the affidavits were regarded merely as having evidentiary value upon the question of what constituted a reasonable time. In Doherty v. Harris Pine Mills, Inc., 315 P.2d at page 587, the holding in Hughes v. Heppner Lumber Company is stated as follows: "The majority of the court held that in 1951 a reasonable time for removal of the reserved timber had expired."

shows no change whatever in assessment of the Warlick-Tucker-Seaver property from 1941 on through 1953. It even shows an addition to the assessment for 1954 on account of timber value.

Certain it is that Seaver himself was not misled by the filing of these affidavits into any belief that Siuslaw or the defendant had abandoned its timber rights in this land for on August 10, 1955, he entered into a logging contract with defendant for the logging of the latter's timber on the Seaver land in Sections 31 and 6. Under this contract he cut and removed 108,000 board feet of timber, delivered it to United States Plywood and received payment therefor. Seaver never made any claim against United States Plywood or Siuslaw charging wrongful cutting of timber until about the time he commenced this action in 1956.

It is clear that an abandonment of an interest such as that which Siuslaw had acquired in this timber could not be found to have occurred in the absence of clear evidence of an intent to so abandon. The trial court found there was no such intent; it found that the assessor was not misled or deceived; that defendant did pay the taxes on the remaining timber after the affidavits were filed; and that in any event Mc-Pherson was not an officer authorized to relinquish, abandon or in any way prejudice Siuslaw's title to the timber, and that he did not intend to do so. Since we are unable to say that the trial court's findings or any of them were clearly erroneous, they must be sustained.

As previously noted, we have dealt with this record upon the assumption that the language in the contract referring to merchantable timber was not ambiguous and hence that extrinsic evidence of the intention of the parties as to the terms of the agreement was inadmissible. In the language of ORS § 41.-740, we have proceeded upon the theory that "there can be, between the parties and their representatives or successors in interest, no evidence of the terms of the agreement, other than the contents of the writing." Some evidence of that kind was received over the objections of the appellant. It is plain that the trial court's findings were not based or predicated upon any such testimony. In the oral opinion the judge stated: "Whether we construe the contract by its wording alone or whether we construe it in the light of the position of the parties, I can't see that any interpretation is valid other than that the buyer was to get all of the timber."

We find no error in the record in any respect specified by the appellant. The judgment is affirmed.