Argued October 26, 1954, reversed April 29, petition for
rehearing denied July 6, 1955

## MABEL HUGHES *v.* HEPPNER LUMBER COMPANY

## W. E. HUGHES *v.* HEPPNER LUMBER COMPANY

## W. E. HUGHES ET AL. *v.* HEPPNER LUMBER COMPANY

283 P. 2d
286 P. 2d 126

*James C. Dezendorf,* Portland, argued the cause for appellants. On the briefs were Koerner, Young, Mc-Colloch & Dezendorf and William J. Moshofsky, Portland.

*Gunther F. Krause,* Portland, argued the cause for respondent. On the briefs were Krause, Evans & Lindsay, Portland and Mahoney & Fancher, Heppner.

Before LATOURETTE\*, Chief Justice, and WARNER\*\*, LUSK, BRAND and TOOZE, Justices.

## LATOURETTE, J.

The present appeal involves title to approximately 3,300,000 feet of fir and pine timber situated on 1852 acres in Morrow county. Plaintiffs, the fee owners, sought to quiet title to the land in question. Defendant cross-complained claiming title to the timber in question. The trial court found for defendant and gave it

---

\* Chief Justice when this case was argued.
\*\* Chief Justice when this opinion was rendered.

until December, 1955, in which to remove the timber from the premises. Plaintiffs appeal.

On February 23, 1939, the Hugheses deeded to the Bridal Veil Lumber & Box Company, predecessor in interest of defendant Heppner Lumber Company, "all pine and merchantable fir timber" situated upon approximately 1160 acres of land herein involved. On February 25, 1939, the Bridal Veil Lumber & Box Company conveyed to the Hugheses approximately 692 acres of the land in litigation. The deed contained the following reservation: "The grantor, however, reserves all the pine and merchantable fir timber on the above described premises together with the right to log the same at its convenience." As a part of the transactions the Lumber Company agreed to and did pay one-third of the taxes thereafter levied on the property. As the timber was cut, as hereinafter explained, it ceased paying taxes. In 1940 the Heppner Lumber Company was incorporated and succeeded to the rights of the Bridal Veil Lumber & Box Company in the timber.

The evidence discloses that the land involved was mountainous, with deep ravines. The timber in controversy is that largely found in the above areas with the exception of a small tract in a remote section of the property which was not listed on the tax roll as timber land and which was admittedly inaccessible. For a number of years thereafter logging was carried on by "gypo" loggers with horses and the entire area was logged with the exception of the remote part hereinbefore mentioned. As the timber was logged it was delivered to defendant's sawmill to be cut up into lumber. Periodically, as logging was concluded, from 1939 to 1948, inclusive, in order to remove the timber from the tax rolls and relieve the company from paying taxes

on the same, its officers and agents executed and delivered affidavits to the county assessor in which it stated that it had cut and removed all the timber situated on the premises involved excepting on a remote and inaccessible portion of the property which had no timber listed on the assessment roll.

At the conclusion of the logging operations in 1948, defendant pulled up stakes and, like the Arabs, folded its tents and silently stole away. Shortly thereafter plaintiffs fenced most of the lands and installed a gate which was kept padlocked.

No claim on the part of defendant was made to any timber remaining on the property until in 1951 when the prices of lumber soared some 400 per cent over that which existed in 1939. It was then that plaintiffs instituted the present suit.

Plaintiffs' position is tersely stated in their brief as follows:

"(1) The respondent has already cut and removed all the timber it ever owned;

"(2) If there is any such timber left (which appellants deny) respondent forfeited its right thereto because a reasonable time for removal has expired, and

"(3) If there is any such timber left (which appellants deny), respondent relinquished its right thereto."

The controlling feature of the case, in our opinion, is that stated in proposition No. 1 of appellants' brief above set out. In other words, did defendant remove all the merchantable timber as contemplated by the parties in 1939, during the years 1939 to 1948, inclusive?

■ The parties agree on the issues, at least in respect to this question. Defendant claims and plaintiffs dis-

claim that the timber now contended for was merchantable timber in 1939. Defendant asserts therefore that they have a reasonable time to remove it. If the timber, however, was not merchantable at that time it follows that the "reasonable time for removal" doctrine would have no applicability.

A grant of merchantable timber is a grant only of the merchantable timber on the land at the date of the contract. *Rayburn et ux. v. Crawford et ux.,* 187 Or 386, 398, 211 P2d 483.

■ What is merchantable timber, in the absence of agreement, is a question of fact. We quote from *Dahl et al. v. Crain et ux.,* 193 Or 207, 225, 237 P2d 939, as follows:

"It may be conceded that there is no definition of 'merchantable timber' which will fit all occasions and all localities. Although a term very frequently used in timber sales contracts, as it was used in the contract here, nevertheless, it is one having no definite and fixed meaning. What may be 'merchantable timber' at one time or place may not be deemed such at another time or place. In determining what is covered by the term at a particular time and in a particular locality many factors are considered. Size and quality are of prime importance. Location, accessibility, demand, and market conditions are regarded. We do not assume to enumerate all the elements involved in the term. * * *"

Again, in *Parsons v. Boggie,* 139 Or 469, 471, 11 P2d 280, we said:

"* * * The court must, as far as possible, construe the instrument from the words used as showing what the parties had in mind at the time of its execution. The respondent sold and the appellant bought with the understanding that the timber was to be removed. We must also take into consideration the circumstances surrounding the parties

at the time the sale was made; *also their attitude toward the subject matter subsequent to the execution of the contract. * * *"* (Italics ours.)

. One of the factors in determining the merchantability of timber, according to Glenn Parsons who was employed by defendant Lumber Company and had charge of its cruising and logging operations, is whether or not a timber tract is operable. He was called as a witness by defendant and testified that he had cruised the timber on the tract in question and that in cruising timber the cruiser's objective is to determine, among other things, what is an operable tract. His testimony follows:

"Q When you say operable, what do you mean by that? A Some areas due to certain conditions make a tract operable and some of them inoperable due to the volume, terraine [sic], and so on, accessibility, whether you could go in and log it and do it economically.

"* * * * *

"Q Now even though you might have some good timber in a certain location, it might not be operable? A That is right; it would depend upon accessibility along with it."

■ Since operability depends upon volume, terrain and accessibility, we are satisfied that under the circumstances of this case defendant never did consider the tracts on which the present timber is located as operable.

Bruce Hoffman was called as a witness by plaintiffs. He is a consulting forester with offices in Portland. He was employed for many years by the government forest service in Alaska, Oregon, Washington and northern California. From 1919 until 1928 his work primarily had to do with pine operations in the vicinity

of Klamath Falls, Medford and eastern Washington. He testified that his duties were

> "to make up and consider the lay-out of the areas in regard to pine sales that the Forest Service planned to make, and at the same time, to make a very thorough and complete study of the costs of logging operations as well as manufacturing operations in pine. We attempted to conduct quite a series of time studies and production, and keeping up that work in order to give us the opportunity to know what the mills were operating on in the areas."

Intermittently he was employed by private companies, one being the Edward Hines Lumber Company in Burns. He testified:

> "I cruised and appraised first their large tract, 40,000 acres, on the Rodaugh Mountain, and I attempted to figure out the most practical way of getting that stuff out of there, whether to take it out in logs, and attempt to put a small mill at Seneca, or to the Hines Mills near Burns, or manufacture on the ground in small mills or to put a mill in at Dayville."

Other employment included that with the Weyerhaeuser Timber Company, the Shevlin-Hixon Company at Bend, and others. He testified that he was familiar with the land in question, having traveled over the area twice. He further testified:

> "Q  Now, did you make a sufficient examination of those lands to determine what logging operations had been conducted on the land and to determine the areas which had been logged over?  A  We went over the greater part of it.

> "Q  And you did see it with that in view, see most of the area when you were over there?  A  Yes. Well, as it was lying there, it is characteristic of other similar lands in Eastern Oregon and in Southern Oregon logged over under the conditions of 1939. Operators went in and took the best out and

left the rest there. What was left is practically of no value under those conditions at that time.

"Q In other words, you could state in your opinion that the logs which had been taken out of there —the logging which had taken place there, and during the logging operations which had taken place, all of the timber which had commercial value in 1939 had been removed, is that right? A I would say that it was removed."

Mr. Orville Smith, president, general manager and director of the defendant, testified as follows:

"We took trees according to—at that time according to more or less the accessibility and the quality that could be obtained to get the timber into the mill at a profit. We did occasionally—we had to leave some that the cost would be a little too great to make a profit on it; after we got it in, the log costs would be too great."

The deeds in question were executed in 1939 at the tail end of the depression which swept the country. The price of timber was low and logging was conducted by horses. It was deemed impracticable and commercially not profitable to log in the deep ravines and mountain tops where timber was not readily accessible. Loggers hired by the defendant logged the entire area as was customarily done at that time, and, as various tracts of timber were logged, reports were made to the company and the affidavits of removal were executed and delivered to the assessor. The defendant does not dispute the making of the affidavits but attempts to evade their evidentiary value by claiming that they were misled by the reports of the loggers. It will be remembered that the timber had been cruised by defendant's employees, including Glenn Parsons, whose testimony follows:

"Q What sort of work do you do for them? A I look after the logging operation, cruising, line

running, timber affidavits, cutting and I check on the gypos to see that we are getting compliance with the contracts.

"Q The logging—you supervise the logging, but you don't actually do the logging? A That is correct; I see that we are getting compliance with the contract and log problems."

Defendant makes much of the trial court's finding that the affidavits were based upon erroneous information furnished to defendant and are therefore not binding on defendant. It is urged that since the court saw and heard the witnesses we should not disturb its finding. In the present case the evidence is more or less documentary and based upon testimony of the officers and employees of defendant. This being so, we are in the same position as the trial court with respect thereto. Indeed, the following finding is based upon the court's misconception of the evidence:

"* * * Representatives of the defendant had not examined the property themselves before making the affidavits. Sometime prior to 1949, representatives of the defendant examined the property and discovered that, in addition to those areas not logged at all, a large amount of marketable timber remained upon the property."

In this connection, it will be noted that the last affidavit filed by Allen L. Piper, forester of defendant company, was executed on February 28, 1949, obviously after the time when a representative of the defendant examined the property.

It is clear to us from a close scrutiny of the record that when defendant's officers and employees signed the affidavits they knew what they were doing.

The testimony of Earl Blake, a cattle rancher and owner of a small sawmill in the vicinity, pointedly sug-

gests that the defendant had cut all the timber it thought merchantable and desired to cut. It follows:

"Q Now, do you recall a conversation that you had with Mr. Orville Smith of the Heppner Lumber Company, concerning the Hughes' land, which is involved in this controversy and which is indicated by the red and blue shaded areas on the map on the black board, which is Plaintiff's Exhibit No. 10? A I do, yes.

"Q Would you state when and where this conversation took place? A It was about a year ago last spring in Mr. Smith's office.

"Q That is in Heppner, Oregon? A Yes, in the Heppner Sawmill office.

"Q Would you state what was said? A I was there for the purpose of arranging to take their lumber out for them, and I also asked him if he knew where we could get some timber, that we were short, and he said that he didn't know. Then I asked if there wasn't something on the Hughes' tract and he said that there was none, that they had logged that off."

█ There is another reason why plaintiffs should prevail in this case. Since no time limit was specified in the deeds for the removal of the timber, defendant had a reasonable time for its removal. *Rayburn et ux. v. Crawford, et ux.,* supra.

Glenn Parsons, defendant's logging expert, testified:

"Q * * * How long would it take to log it off, leaving off the argumentative part? A Four months.

"Q And it could have been taken off in 1948 in 4 months, couldn't it? A I think it could."

Mr. Smith, president of the company, testified:

"Q Assuming that there is approximately 3,500,000 feet of merchantable pine and fir on the

property now and that it is scattered over approximately 2,000 acres of land, how long would it ordinarily take to log that if you were trying to do it in a reasonably economical fashion. * * * A It would take about one season, a logging season, to log it. In that area it is about 6 months. They could log about 6 months out of the 12.''

For over a period of years after defendant ceased logging operations no effort was made by it to remove the timber. In our opinion a reasonable time had elapsed for its removal.

Reversed.

WARNER, C. J., dissenting.

I am compelled to dissent for the reasons that follow, but primarily upon the ground that plaintiffs failed to sustain the burden of proving that the lumber company's title to the timber was forfeited by a lapse of a reasonable time in which to harvest it.

As a result of a stipulation of the parties and order of the court, the three above entitled suits were consolidated for the purposes of appeal and argument. Justification for this course is found in the identical character of the complaints, answers and replies, except for the legal descriptions of the several parcels of real property involved. These lands comprehended approximately 2,000 acres located in what is known as the Blue Mountain Pine Belt in Morrow county, Oregon.

All the plaintiffs seek to quiet title in themselves to cut-over timber lands separately described in their respective complaints. From decrees in favor of the defendant Heppner Lumber Company, the plaintiffs appeal.

Pursuant to an agreement for the exchange of land and timber made between the plaintiffs Hughes or their

predecessors in interest and the Bridal Veil Lumber & Box Co., predecessor to the defendant Heppner Lumber Company, the following transactions were had between them:

(1) On February 23, 1939, A. Percy Hughes and Mabel A. Hughes (one of the appellants) deeded to the Bridal Veil Lumber & Box Co. "all pine and merchantable fir timber" situated upon approximately 1,160 acres of the land herein involved. By the terms of the conveyance, the grantors retained title to the land and agreed to pay the taxes due thereon, the grantee agreeing to reimburse them to the extent of one third of the taxes. This parcel I will hereinafter refer to as the "Hughes tract".

(2) On February 25, 1939, Bridal Veil Lumber & Box Co. conveyed to the plaintiff-appellant W. E. Hughes (also known as Edwin Hughes) and one Arthur Hughes approximately 692 acres of the land involved in this suit, reserving, however, to the grantor "all the pine and merchantable fir timber" on said premises, "together with the right to log the same at its convenience." This parcel I will hereinafter refer to as the "Pearson tract".

Neither of the deeds specified a term for the removal of the timber.

The net result of these transactions, as of the dates thereof, was to leave the plaintiffs owning title to the land described in the deeds, which they have ever since used for grazing only. Bridal Veil Lumber & Box Co. thereafter owned all the pine and merchantable fir timber thereon. It subsequently transferred this interest to the defendant-respondent Heppner Lumber Company (hereinafter called the lumber company and meaning thereby not only the respondent but its predecessor, Bridal Veil Lumber & Box Co.).

Between the years 1939 and 1948 the lumber company removed the greater part of the pine and merchantable fir timber from the areas described in the deeds. This was done by different contract loggers, known to the industry as ''gypos''. For various reasons, including weather conditions limiting logging operations to six months a year, logging difficulties, lack of equipment, neglect on the part of the respondent's contract loggers and, in part, to wartime restrictions, a portion of the merchantable timber alleged to have been on the deeded areas in 1939 had not been logged by the lumber company at the time of the commencement of the instant suits. The terrain upon which the timber was situated was mountainous and broken by many precipitous ravines and high ridges. This resulted in the loggers leaving some trees on high ridges and in isolated, relatively inaccessible pockets. There was also left a scattering of low-quality timber and yellow-bark trees in other portions of the area.

As I have previously indicated, the appellants are the undisputed owners of the fee to all the lands in the Hughes and Pearson tracts and have been ever since the execution of the deeds hereinabove referred to, subject, however, to such interest as the lumber company may have in and to the timber reserved or conveyed to it by those deeds. The plaintiffs claim that the timber which was reserved by or deeded to the lumber company has been removed by the company's operators and, therefore, what timber presently remains is their own. In short, plaintiffs claim an absolute and complete ownership of the real property, including all timber now growing thereon, to the exclusion of any right, title or interest therein as claimed by the lumber company. Both plaintiffs and defendant seek to have their respective titles so quieted.

The basic issue for determination is: Has the respondent lumber company any interest in any timber presently standing on the land?

The appellants Hughes assert that the respondent lumber company has no interest in the timber for any one of the following reasons: (1) all timber owned by the lumber company had already been cut and removed; (2) if any such timber was left by respondent (which the appellants deny), then they claim that the lumber company had forfeited its right thereto because a reasonable time for its removal has expired; and (3) if any such timber remained, the lumber company had long since relinquished its right thereto.

For reasons that will presently appear, I first address myself to appellants' proposition (2). It is, in essence, a challenge to the soundness of the court's Finding XI, upon which respondent places heavy reliance. That finding reads:

> "In the vicinity, timber contracts and deeds, involving areas of 2,000 acres, frequently provide for extended terms, for instance 15 years, for removal of the timber. Under all of the facts, 14 years is short of a reasonable time for removal of defendant's timber, and two additional years are reasonable for the removal of the remaining timber."

The law is settled in Oregon that when the contract does not fix the time in which the timber must be removed, it must be removed within a reasonable time. *Rayburn et ux. v. Crawford et ux.,* 187 Or 386, 399, 211 P2d 483; *Parsons v. Boggie,* 139 Or 469, 472, 11 P2d 280. Also see Kinney, Essentials of American Timber Law, 146-149, § 116; 34 Am Jur 507, Logs and Timber, § 27; 54 CJS 704, Logs and Logging, § 19.

I have already noted that neither the preliminary agreement previously made between the parties nor the

deeds thereafter given pursuant to it specified the time in which the timber was to be removed, with the exception of the lumber company's deed of February 25 with a reservation reading, "all the pine and merchantable fir timber * * * together with the right to log the same *at its convenience.*" (Italics mine.) See 54 CJS 704, Logs and Logging, § 19. Such language is similar in import to the language of the contract in *Parsons v. Boggie,* supra, reserving the right to remove the timber " '*at any time*' ", and held in the Parsons case to mean only a reasonable time. (Italics mine.)

To lay a proper foundation for a favorable finding that a reasonable time had elapsed, it was incumbent upon the plaintiffs to prove, under the formula of the Rayburn and Parsons cases, what was, in fact, a "reasonable time", that is, the length of time necessary in which to accomplish the complete removal of all the timber the lumber company had purchased or reserved, including when such "reasonable time" began and when it terminated. The beginning point is one of easy determination. It necessarily runs from the dates of the deeds, that is, from the latter part of February 1939. *Rayburn et ux. v. Crawford et ux.,* supra, at p. 399. Having once established the date when the "reasonable time" began to run, the next step was to establish the length of time for removal. Our own cases furnish the rule for this calculation.

In *Parsons v. Boggie,* supra, at p. 472, we observed that a "reasonable time" depends upon "the particular facts in each case." In *Rayburn et ux. v. Crawford et ux.,* supra, at p. 399, it is said (quoting from *Union Sawmill v. Agerton,* 181 Ark 144, 25 SW2d 13, 14):

" '* * * What is a reasonable time depends upon circumstances such as the quantity of timber,

the character of it, facilities for marketing it, and all other facts and circumstances showing the conditions surrounding the parties *at the time of the execution of the contract.* In case of dispute, this becomes a question of fact for the determination of the court or of the jury trying the case. * * *' ” (Italics mine.)

Also see 34 Am Jur 507, Logs and Timber, § 28; 54 CJS 705, Logs and Logging, § 19.

Thus it follows that the court must be placed, so far as possible, in the same situation the parties were in when they executed their respective deeds. In that position, the court then measures the probable total time for the logging of the timber *in terms of circumstances and conditions prevailing in the theater of operations in 1939.* With these factors established and in mind, the court will then look forward prospectively to determine what would, in fact, constitute a reasonable time to complete the removal of the timber deeded or reserved.

This concept bars a retrospective consideration, that is, a speculative examination of facts and circumstances, particularly when made in terms of improved methods of logging unknown to the parties in 1939 but which might have come into existence after the cutting operations began in February 1939. It would be easier to say in September 1953, the month of the trial and more than 14 years after the removal of the first timber began, that, in the light of the then known more modern logging techniques and more modern machinery then in use in logging operations of the community where the premises are located, it should take, for example, only four months or six months to complete the removal and far less than the term of 14 years stated in the decree. However, such a method of deter-

mination is not contemplated by the Rayburn and Parsons cases.

No doubt, a retrospective determination as of trial time in September 1953 would result in a shorter "reasonable time" than if that more or less illusive factor were established prospectively as of February 1939. However, to make the approach on that basis would vary the initial agreement as made by the parties subject to and under the circumstances and conditions prevailing in 1939. If the forward-looking determination of "reasonable time" made as of February 1939 might, for example, justify a period of 20 years in which to remove the timber, then the lumber company would be entitled to its full bargain, that is, 20 years in which to accomplish the harvest of its trees, and could not be limited to a lesser term of perhaps 15 years, which might seem to be a justified estimate when derived by looking backward 14 years from September 1953. In short, the terminal date of the reasonable period would be the date of the deeds, plus such length of time as was found to be reasonable when determined under the rule laid down in the Rayburn and Parsons cases, with such extension given for equitable reasons hereinafter referred to.

Having first made a determination of what was a "reasonable time" to harvest the logs, according to the rule in the Rayburn case, there is nothing to preclude the court from thereafter taking into consideration certain events, if any, which may have occurred after the date of the deeds and which in their nature could not have been in the contemplation of the parties at the time of the execution of their agreement. Such unforeseen events generally are those beyond the control of the grantee and of a nature to interrupt or delay the mechanics of the timber harvest and of a

character which would warrant a court in proper cases granting an extension but not a curtailment of the previously determined "reasonable time" by way of compensation for the time lost because of the happening of such unforeseen or unforeseeable events.

It is settled that a court of equity may extend the time for cutting or removing the timber if there are equitable grounds of excuse for not removing the timber within such time as the court may have earlier determined as a reasonable time. Acts of God or acts of the vendor or grantor resulting in unforeseen delays exemplify but do not limit the reasons for such equitable indulgence in proper cases. 34 Am Jur 515, Logs and Timber, § 36; 54 CJS 710, Logs and Logging, § 19.

There is much evidence in the record from the mouths of plaintiffs and defendant's witnesses indicating varying periods of time that it would take *to remove the remaining merchantable timber*; but we are not concerned here as to the length of time it will take to harvest the 3,347,000 feet of the 1939 merchantable timber now on the premises, whether done by prevailing methods of logging or those of the 1939 era. Our only concern is whether the removal of the remaining timber can be completed within the time contemplated by the parties or their predecessors in 1939, plus such additional time, if any, as the court may allow by reason of the happening of events not in the contemplation of the parties when the deeds were executed and delivered and which might equitably excuse delays by reason thereof. For example, if this court could find from the evidence that in 1939 twelve years appeared to the parties as a reasonable time in which to remove the timber, but because of wartime restrictions imposed by the federal government the lumber company was delayed five years, then the period for removing the tim-

ber would not terminate until February 1956 and what timber remained would have to be removed before then or the lumber company's rights therein would be forfeited.

It is apparent from the record here that each party was persuaded the burden of producing evidence and proving whether or not a reasonable time had elapsed rested upon his adversary. Such is the trial record and such is the argument of the parties in their respective briefs. It is, therefore, necessary to determine where this burden actually reposed in order to appraise properly the result which follows. In this case the discovery of where the burden lies becomes very important in evaluating the sufficiency of the proof on the issue of "reasonable time".

The true test is to be found in the nature of the pleadings peculiar to a suit to quiet title. In such a suit the plaintiff must recover on the strength of his own title and not on the weaknesses of his adversary's title. The burden is on plaintiff to establish that he has a perfect legal or equitable title, regardless of whether defendant's title is valid or invalid. As a result, when properly in issue under the pleadings, plaintiff has the burden of showing that his title is superior to the defendant's. *Murphy.v. Bjelik,* 87 Or 329, 345, 169 P 520, 170 P 723. This is true even where each party claims to be the owner of or have some interest in the subject property and when it is incumbent on each to make good by evidence his affirmative averments touching his own title. *Darling v. Christensen,* 166 Or 17, 26, 109 P2d 585; *Durkin v. Ward,* 66 Or 335, 338, 133 P 345. Also see 74 CJS 119, Quieting Title, § 76.

Where the defendant asserts an adverse claim, as here, it becomes incumbent upon the plaintiffs to prove that such a claim is invalid or, in terms of plaintiffs'

allegations in this matter, that the lumber company's claim of interest or estate "is false and without any right." 74 CJS 121, Quieting Title, § 76.

When a plaintiff has made out a prima facie case, the burden of going forward with the evidence will be shifted to defendant. *Evans v. Marvin*, 76 Or 540, 544, 148 P 1119. In the instant matter it is necessary for plaintiffs to make out only a prima facie case in order to put the defendant lumber company on its proof; but the burden of proof, which rests upon plaintiffs when the allegations of the complaint are denied, *does not shift*. If defendant has established the due execution of the instrument under which it claims, the burden is again cast on plaintiffs to show facts in avoidance; and if they succeed in doing so, the burden of going forward with the evidence returns to defendant. 74 CJS 121, Quieting Title, § 76.

The confusion and not infrequent loose statements which are sometimes found concerning the purport of the "shifting of the burden of proof" in suits of this kind prompt us to employ the following clarifying statement as conveying our meaning here:

"The courts frequently do say that when plaintiff in an action to quiet title has made out a *prima facie* case the burden of proof shifts to defendant. The difficulty arises because the words 'burden of proof' are used in two senses; one to indicate the burden which rests upon the plaintiff when the allegations of the petition are denied, and the other to indicate the duty to meet and rebut some evidence introduced by the adverse party by proof to overbear it in the mind of the tribunal. The burden of proof in the former case does not shift. The duty of going forward with the evidence may shift from time to time."

*Lake Front Corp. v. Cleveland,* 21 Ohio Opinions 1, 7, affirmed 36 NE2d 196, appeal dismissed 139 Ohio St 138, 38 NE2d 410.

The allegations of plaintiffs' complaints were in the usual form, in that they simply and directly alleged ownership and possession of the property in controversy and also alleged that the defendant lumber company "claims some interest or estate * * * adverse to plaintiffs, but said claim is false and without any right."

After a general denial the lumber company, for a separate and further answer, alleged, so far as pertinent here:

"I.

"Defendant is the owner of all of the pine and merchantable fir timber situated upon the real property described in the complaint, and defendant and its predecessor has [sic] paid in full and the plaintiffs and their predecessor have received payment in full for the purchase price of said timber. By the terms of the conveyance, defendant has a perpetual right to remove the pine and merchantable fir timber situated on said real property, or, in any event, a reasonable time to remove said timber at its convenience. *A reasonable time for the removal of such timber has not elapsed.*

"II.

"*At the time or times when defendant and its predecessor acquired or retained ownership of the standing timber, a period of from 15 to 99 years was regarded as a reasonable time for the removal of timber from lands located in the general vicinity of the real property described in the complaint.*" (Italics mine.)

In terms of pleading, the complaints and defendant's answer contain all the essential allegations de-

manded in a suit of this nature. The answer, however, goes beyond the boundaries of good pleading to the extent that it contains several unnecessary, but not fatal, averments. This fault is found in the pleading of anticipatory defenses. The parts of defendant's further and separate answer vulnerable to that criticism are those which are quoted above, with emphasis upon that portion of the answer which alleges that the lumber company's title to the standing timber is encumbered with a condition subsequent, i. e., it is subject to termination upon the happening of a future event—the elapse of a reasonable time in which to remove the timber conveyed by the deeds in controversy.

The rule is established that the pleader is under no legal obligation to the adverse party to advise him of the defense he should interpose, nor is it necessary or proper for a pleader so to do, and under it the pleader ought not to anticipate or negative a possible defense. A condition which qualifies or defeats the pleader's title, being a condition subsequent, may be safely ignored by him in the pleading. "In general, non-performance or non-occurrence of a condition subsequent need not be alleged", since its nonperformance is a matter of defense to be availed of affirmatively by an answer or, as in this case, by a reply. 71 CJS 193, Pleading, § 80; Phillips, Code Pleading 2d ed, 303, § 294; and see notes in Pomeroy, Code Remedies 5th ed, 779, § 471, under heading "Conditions Subsequent, Negativing".

The foregoing rule was employed and applied in *Little Nestucca Road Company v. Tillamook Co.*, 31 Or 1, 8, 48 P 465, 65 Am St Rep 802. Also see *Martin v. National Lifestock Ins. Assn.*, 65 Or 29, 32, 131 P 511; 71 CJS 193, Pleading, § 80; 41 Am Jur 351, Pleading, § 87; 1 Bancroft, Code Pleading, 287, § 168; Bay-

lies, Code Pleading and Practice 2d ed, 45, § 7; Bliss, Code Pleading 3d ed, 316, § 200; Boone, Code Pleading, 16, § 11; 4 Encylopaedia of Pleading and Practice, 628; Phillips, Code Pleading, supra, p. 303, § 294.

This court has often said that in an action to quiet title to real property where each party claims to be the owner in whole or in part of property wherein title is sought to be quieted, the burden is on each to make good by evidence his affirmative averments touching his own title to it. *Duniway v. Cellars-Murton Co.*, 92 Or 113, 121, 170 P 298, 179 P 561; *Murphy v. Bjelik,* supra, at p. 345; *Durkin v. Ward,* supra, at p. 338; *Clark v. City of Salem,* 61 Or 116, 121, 121 P 416, Ann Cas 1914B 205.

However, this burden does not carry with it the obligation to make good the pleader's affirmative allegations which are in the nature of anticipatory defenses. This is for the evident reason that such allegations in anticipation are superfluous, immaterial and improper as they do not state facts belonging to the pleader's case and may be disregarded by the adversary. 1 Bancroft, Code Pleading, supra, p. 288, § 168; Bliss, Code Pleading, supra, p. 316, § 200; 1 Sutherland, Code Pleading, 162, § 235.

The reason for the law's antipathy for anticipatory pleadings is stated in Mr. Justice ROBERT BEAN's opinion in *Savage v. Savage* (a suit to quiet title), 51 Or 167, 171, 94 P 182:

"The better practice in this class of cases is for a court to decline to determine the validity of defendant's claim, even if plaintiff has assumed to set it out in the complaint, until he has disclosed it by answer. Its nature is necessarily known to him, but may not be to the plaintiff, and therefore the court, in attempting to adjudicate it before answer, may be deciding a mere moot question."

Without moving against the irrelevant anticipatory allegations found in defendant's answer, the parties went to trial. Unnecessary anticipatory allegations do not vitiate the pleadings of which they are a part but, as suggested by Mr. Justice BEAN in the Savage case, frequently create situations during the progress of the trial which ought to be avoided when possible. Here, the lumber company's answer apparently resulted in a mistaken notion of when the *burden of going forward* shifted in contradistinction to who had the *burden of proof,* and a further erroneous notion that having pleaded allegations anticipatory in character, the defendant pleader thereby incurred a burden to supply evidence in proof of these immaterial allegations of its answer.

After introducing the contract and deeds provocative of the present suit, through and under which plaintiffs and defendant each claim title, and several statements—referred to in the majority opinion—filed in the assessor's office indicating the removal of taxable timber from a large area of the property described in the deeds, the plaintiffs rested their case, as they properly could at that stage of the trial. If nothing else was shown, deeds operating to vest title in fee simple in plaintiffs, as they claim, constituted at least a prima facie proof of the allegations of the complaint. *Evans v. Marvin,* supra, 66 Or at p. 340. When that point was attained, the burden of going forward with the evidence shifted to the defendant lumber company. *Evans v. Marvin,* supra.

I have noted that the alleged titles of the opposing parties spring from the same conveyances introduced by plaintiffs. In fact, they served a twofold purpose by proving a prima facie case of title for the plaintiffs and also for defendant. Although it was incumbent

upon the defendant to establish its own case, at this juncture it was not bound to do more than make a prima facie showing. As hereinbefore said, this did not impose upon the lumber company an obligation at that point in the trial to establish, as a part of its prima facie case, proof that its title to the timber was subject to extinguishment by removal or, if not entirely removed, then by an elapse of a reasonable time measured from the date of the deeds, nor was the lumber company then bounden to establish what constituted a reasonable time for removal.

When the defendant had established the execution of the deeds under which it claimed, in the normal course of presentation the burden again shifted back to the plaintiffs to show facts in avoidance; and if they had so done, then the burden of going forward would again have shifted back to the defendant to rebut, if it could, the showing made by plaintiffs in avoidance of the lumber company's claim of title in the timber.

However, having unnecessarily assumed, as a part of its case in chief, to offer without objection evidence concerning the nonoccurrence of the condition subsequent, the defendant reversed the traditional order of presenting the evidence in a suit of this kind.

I venture to say that had the parties carefully observed the rules relating to the sufficiency of proving a prima facie case and the burden imposed upon the plaintiffs to go forward and avoid the defendant's prima facie proof of title, a stronger and better showing would have been made by both parties, or by one or the other of them.

I have diligently read and considered all the testimony accompanying the transcript and, for the reasons which follow, am of the opinion that there is no clear and convincing evidence in the record, brought forward

by either party, from which it may be concluded what is a reasonable length of time in which to remove the timber in controversy and, hence, whether or not such "reasonable time" has elapsed.

Turning to a consideration of the evidence of the several witnesses produced by plaintiffs and defendant on the question of when defendant's rights in the timber terminate, let us first look to plaintiffs' case on this point.

The plaintiffs depended solely on the testimony of Bruce E. Hoffman, a consulting forester and admittedly a person of rich background in forestry, to sustain their position that the time for removing the timber had long since elapsed. Hoffman testified that 15 million feet could have been removed in two years; but in all his estimates of time for removal of merchantable timber, he referred to and defined "merchantable timber" as that kind of timber "which can be converted into *products that can be marketed at a profit*". (Italics mine.) Profit is not a proper element of merchantability when employed in the phrase "merchantable timber"; it does not lose its merchantable character if it is salable, even though its sale cannot be consummated at a profit to its owner.

In *Dahl et al. v. Crain et ux.*, 193 Or 207, 237 P2d 939, this court had before it a contract for the sale of " 'all merchantable timber' " located upon a tract of land in Crook county. The ultimate purchase price was dependent upon a cruise made by a cruiser selected by the buyers. The evidence revealed that the only timber cruised was such as "would *'render a net profit* to the type of sawmill Mr. Johnson [one of the buyers] was planning to operate' ". (Italics mine.) The cruiser testified that all other timber was disregarded. (193 Or 218) In canceling the contract because of misrep-

resentations made to the sellers Crain as to the true amount of "merchantable timber", the court said, at p. 225:

"It must be kept in mind that the parties were dealing with 'merchantable timber.' It is so described in the contract entered into between them. At no time during their negotiations did Johnson even intimate to defendants that he considered as 'merchantable timber' only that which would return to him a net profit in the type of operation which he claims he had in mind. We know of no authority, nor has any been cited to us, that defines 'merchantable timber' to be only such as that contained in the instructions given Milius [the cruiser hired by Johnson]."

The extent of the merchantable timber in the instant matter, with its incident of fluctuating values when quantitatively estimated in terms of timber which could be marketed at a profit, furnishes no sound basis, of course, for the determination of what was on the premises in 1939, or in any year thereafter, which could be of assistance to the court in making this necessary finding of what was a reasonable time in which to harvest such timber.

The majority opinion leans heavily upon the testimony of plaintiffs' witness Hoffman, forgetting apparently that his conclusions rest upon his own premise that "merchantable", when applied to timber, must be read as synonymous with "profitable". His phrases quoted in the majority opinion are likewise tinctured with the "profit" concept of merchantability when he speaks of "What was left is *practically of no value under those conditions at that time*" and again by his affirmative answer when asked if "all of the timber which *had commercial value in 1939* had been removed". (Italics mine.)

So, too, must one read the majority opinion's quotations from the testimony of Orville Smith, vice president and general manager of the lumber company, and Glenn Parsons, who superintended the company's logging operations and cruised the questioned timber just before trial but who did not come into that area until 1945. That is to say, their words, as quoted by the majority opinion, stress the *profit element* when discussing the value of the timber removed or to be removed. This is illustrated by that part of the quotation from Smith's testimony reading, "we had to leave some that the cost would be a little too great *to make a profit on it;* after we get it in, the log costs would be too great." The character of the quoted part of Parsons' testimony likewise stresses the profit factor when he says, "Some areas due to certain conditions make a tract *operable* and some of them *inoperable* due to the volume, terraine [sic], and so on, accessibility, whether you could go in and *log it and do it economically."* (Italics mine.)

"Operable" is defined by Webster as "practical" and when so read in conjunction with the context of Parsons' testimony at the point from which the quotation is excised unquestionably gives to the phrase "merchantable timber" the character of timber which can only be logged and sold at a profit; so, too, the foregoing references to Hoffman's and Smith's testimony. Yet, when so construed, they lose worth and weight as evidence in this matter because as we said in *Dahl et al. v. Crain et ux.,* supra, at p. 225, "We know of no authority, nor has any been cited to us, that defines 'merchantable timber' to be only [that which would return a net profit]." If we introduce for the convenience of easy solution the words "practical", "of commercial value" and "operable" as equivalents of "merchant-

able'' timber—meaning timber that can at a given time be logged and converted into lumber selling at a ''profit''—then we are creating an element and meaning not known to the industry nor to the law in Oregon.

Ordinarily, ''merchantable timber'' of a given contract is determined, in the absence of anything in the writing to the contrary, by the standard in use at the time the deed or agreement was executed. The general rule is that when standing timber of designated dimensions or to be used for designated purposes is sold, only such timber is conveyed as measures up to such dimensions or is suitable for the purposes specified *as of the date of the deed or contract of sale.* 34 Am Jur 504, Logs and Timber, § 22; 54 CJS 696, Logs and Logging, § 17b. The fundamental principles above enunciated were employed in Oregon in *Tenny v. Mulvaney,* 9 Or 405, 410, more than 74 years ago where this court in determining the meaning of '' 'good, sound, merchantable logs' '', as used in the contract then before it in that case, laid down this classic test:

'' * * * The words used in that contract, to denote the quality of logs to be delivered, are 'good, sound, merchantable logs.' Evidently these descriptive words should be construed together, and in view of the use to be made of the logs which the written instrument shows to have been in contemplation of both parties when they executed it, and with reference to the place where the contract was to be performed. (Tenny v. Mulvaney, 8 Or., 517.)

'' A log might be 'good, sound and merchantable' for many purposes, and yet not fit for being manufactured into lumber, and the same log might, owing to a difference in the settled usages of the business in two different localities, be deemed a 'merchantable' log in one and not in the other. 'Merchantable' logs, then, in reference to the busi-

ness of manufacturing lumber in any particular locality, are such logs as are ordinarily used for that purpose at that particular place, and if the usage of the business in that locality requires the logs ordinarily used to be 'good and sound,' then the word 'merchantable' would include the particular meaning of each, and render their employment of no utility in any such contract.''

With the slender thread of support tendered by Hoffman's testimony which, standing alone, is no support for any theory of ''reasonable time'' in this case, the plaintiffs turn in vain to the testimony adduced by the defendant in their effort to supplement that which was their burden to supply. Unfortunately, the weak and incomplete record of ''reasonable time'', as we shall presently see, is utterly inadequate to supply the deficiencies in plaintiffs' evidence.

Let us now consider what, in fact, is the testimony, if any, produced by the defendant lumber company which will assist this court in making any determination of a reasonable period to remove the timber from plaintiffs' lands.

The lumber company's evidence was tendered through Orville Smith, Glenn Parsons and P. W. Mahoney, an officer and director of the lumber company who since 1931 has been actively engaged in the practice of law in Heppner. The testimony of these three men was supplemented by two deeds, hereinafter referred to.

Mahoney's testimony was evidently offered as proof that it was the custom of the community to allow from 15 to 25 years as a reasonable time in which to remove timber of the kind conveyed or reserved here and situated on comparable land of the same approximate area.

In using the word "custom" in this matter, I employ it in its more popular sense as a practice or course of acting. 25 CJS 77, Customs and Usages, § 1. Also see *Maeder Steel Products Co. v. Zanello,* 109 Or 562, 579, 220 P 155.

In 54 CJS 706, Logs and Logging, § 19, will be found this statement on the subject of local custom:

> "A local custom or usage is not ordinarily relevant or material evidence in determining what is a reasonable time, which should not be determined with respect thereto unless its observance was shown to be general and universal as to what became necessarily, by implication, a part of the contract."

Making an established custom a part of the contract accords with the practice in Oregon. In *Harrison v. Birrell,* 58 Or 410, 420, 115 P 141, this court cited with approval and followed the practice then prevailing in the state of Massachusetts. It quoted from *Sawtelle v. Drew,* 122 Mass 229, saying: " 'A custom, within the meaning of the law, if general, is incorporated into and becomes a part of every contract to which it is applicable; if local, of every contract made by parties having knowledge of or bound to know its existence.' " Also see *Hurst v. Lake & Co.,* 146 Or 500, 503, 31 P2d 168.

The substance of Mahoney's direct examination was predicated upon his knowledge gleaned solely from timber contracts relating to timber sales in Morrow county and other counties immediately adjacent thereto and examined in his own practice. In response to a question as to "what periods of time are commonly put in these contracts for the removal of timber off of tracts running up to a couple thousand acres", he

replied: "While there has been variance in contracts, some more and some less, 25 years." He then testified:

"Q Have you represented owners of timber here that negotiated these contracts for the sale of their timber to any saw mills in this general area?

"A Yes, I have.

"Q And have you drawn contracts that provide for 25 year periods for removal?

"* * * * *

"A Yes * * *."

On cross examination Mahoney admitted that he had no personal knowledge of how much timber there was on the land in 1939 and that he did not know how long it would take to remove it. When asked to "name" or produce some of the "similar contracts" providing 25 years for removal of the timber, he was able to refer to only four isolated agreements. Each of the agreements cited was executed subsequent to World War II, i. e., in or about 1948, or nearly nine years after the deeds in controversy. He denied personal knowledge of any others. Only two of the said four agreements mentioned by Mahoney were later offered in evidence, and the others were rejected. His testimony with reference to these two rejected agreements was properly stricken. Relying on his memory, he also referred vaguely to three other contracts, covering less than 2,000 acres, providing for ten years or less for removal, and otherwise not comparable to the present deeds.

The foregoing, in quoted and summarized form, constitutes Mahoney's entire contribution on the subject of a "reasonable time" for removal of defendant's timber.

To successfully prove custom, the witness after being first qualified should have been asked, in substance, whether he knew of any general custom or usage in the

vicinity of the lands in controversy during the time in question, that is, February 1939, relative to what constituted a reasonable time to remove timber of the kind acquired by the lumber company from lands of the same approximate terrain and situated in the area where said timber was growing and comprised of 2,000 acres, more or less. If the witness answers in the affirmative, he should have stated, as a matter of fact and not of law, what was the custom. *Green Mt. L. Co. v. C. & N. R. R.*, 141 Or 188, 192, 16 P2d 1106; 25 CJS 126, Customs and Usages, § 33b; Lawson, Usages and Customs, § 55.

As succinctly stated in *Central Radiator Co. v. Niagara Fire Ins. Co.*, 109 NJ Law 48, 160 Atl 342, and cited with approval in *Green Mt. L. Co. v. C. & N. R. R.*, supra, at p. 192, the rule is " 'If a trade or business custom is to be proved, the first thing to prove is that it exists, i. e., that there is a custom; and if there is one, then what it is.' "

On cross examination it would, of course, be proper to inquire of the witness concerning particular instances wherein a given length of time had been used as the measure of a reasonable time for the removal of timber of the amount and kind and from areas like those found in the deeds here. The method of proving custom is analogous to that of proving reputation. *Green Mt. L. Co. v. C. & N. R. R.*, supra, at p. 192; *Conner v. Citizens Street R. R. Co.*, 146 Ind 430, 45 NE 662.

Mahoney did not qualify to answer the questions propounded to him relative to the customs prevailing in 1939; but even if it is assumed he was qualified, he was not asked and did not answer the vital question as to whether he knew of any general custom with respect to the reasonableness of time necessary in 1939

to remove timber in kind, amount and location comparable to that acquired or reserved by the lumber company under the Hughes deeds. His testimony was limited exclusively to a few contracts he had seen in his own practice, and these had little or no value for the present purpose. No testimony from Mahoney or any other witness can be found affirming the existence of a custom with respect to the time of removal which would warrant the reception of evidence of particular instances of the custom as exemplified by deeds or otherwise.

Orville Smith, vice president and general manager of the lumber company, testified that he did not know how much timber was on the land in 1939, but as of the date of trial it would take only one season to remove the remaining timber. He further testified:

"Q Mr. Smith, do you know how much timber was logged off the Hughes' land?

"A I don't have the figures here, but I could get them.

"Q You don't have any idea what they were?

"A No, I couldn't give them to you, the exact amount. It has been quite sometime ago and I would have to go back to our records."

We interpolate to say that he did not, nor was he asked to, produce such records. His examination continued:

"Q Was it more or less than 15,000,000 feet?

"A I would say less.

"Q Less than 15,000,000?

"A I believe so, that is as near as I can tell you."

Smith's testimony strongly indicates that there had been a striking change in the methods of logging between 1939 and 1953. After having testified that

logging contractors working for the lumber company and elsewhere in the community used plow horses in their operations in 1939, he was asked by defendant's counsel on direct examination:

"Q Is logging still being done by horses today in this country, here in the pine country?

"A Oh, not today, unless there might be on a rare occasion."

The foregoing is substantially all of Smith's testimony on the subject of "reasonable time". His is the only testimony offered by defendant that ventures to say how much timber was removed by the lumber company prior to the cessation of its active operation, which, if more accurate than supplied by Smith, might have been used as a basis for determining what part of an ascertained "reasonable time" was necessary to complete the removal of the balance of the timber. To say, as did Smith, that they removed "less than 15,-000,000 feet" contributed nothing to the solution of the ultimate problem.

Three deeds not mentioned by Mahoney were offered in evidence by the defendant and were admitted by the court for the purpose of showing what might customarily be considered a "reasonable time" in the vicinity of defendant's operation.

Notwithstanding the absence of sufficient proof of the existence of what was customarily regarded as a reasonable time for removal of the timber, as a condition precedent to evidence of particular examples of the custom, we will give notice to the three deeds for what they may be worth. *Green Mt. L. Co. v. C. & N. R. R.,* supra, at p. 192. We do so because these deeds appear to have been very influential in formulating the court's judgment, as is evident from the first sentence of the court's Finding XI reading: "In the

vicinity, timber contracts and deeds, involving areas of 2,000 acres, frequently provide for extended terms, for instance 15 years, for removal of the timber.'' The deeds were marked Exhibits F, G and I and will be so referred to hereinafter.

Exhibit I is a deed from the appellants to respondent's predecessor dated February 21, 1939, and conveying timber on lands not here involved. The language of this deed is identical to the language found in the deed from A. Percy Hughes to the Bridal Veil Lumber & Box Co., a conveyance of timber involved in the instant suit. It is, therefore, devoid of any value on the issue of reasonable time or, indeed, upon any other issue in the suit in that no time for removal is directly or indirectly provided for therein.

Exhibit F, dated May 20, 1940, conveyed ''all the pine timber'' upon 520 acres of land situated in Morrow county near the appellants' tracts. It allowed 15 years for the removal of the timber. It fails, however, to be comparable to the situation presented by the deeds in this matter in the following respects: (1) the timber conveyed is limited solely to pine timber, whereas the deeds in this matter grant title to ''all pine and merchantable fir timber''; (2) the area, 520 acres, is only about one fourth of the aggregate area involved here; and (3) although in Morrow county, the timber conveyed by Exhibit F is about 25 or 30 miles from the Hughes land.

Exhibit G, a deed dated November 24, 1924, involved a reservation of timber upon 4,031.9 acres in the area and permitted the grantor approximately 25 years for removal of the timber ''in accordance with the provisions, terms and conditions of a certain contract made and entered into by and between the parties hereto on the 24 day of November 1924''. The contract men-

tioned was not offered. In addition to the absence of the contract, the terms and conditions of which are made a part of Exhibit G and without which the probative value of that exhibit for the purposes offered is rendered nugatory, we also observe that (1) this deed was dated November 24, 1924, about 15 years before the transactions had by the Hughes' with respondent's predecessor; and (2) it established a time limit for the cutting of timber on twice the amount of acreage owned by the Hughes'.

Without pausing to consider the admissibility of the deeds last referred to, I find that the isolated transactions reflected thereby are entitled to no weight and show no prevailing "reasonable time" for removal of timber which attains the dignity of custom.

Respondent, however, warns against disturbing the findings of the lower court, implying that this court must accord to them a higher degree of legal verity than the law actually demands. It points to Finding XI and says:

"All of the testimony was given by witnesses who testified in the presence of the trial judge. Under these circumstances, the Findings of Fact * * * are entitled to great weight. * * * The major part of appellants' brief voices their disapproval of the conclusions drawn by the trial court from the testimony of the witnesses. The court's Findings of Fact, however, were based upon substantial evidence and as this court has many times said should not be disturbed. * * *"

This obviously is an overstatement, confusing in part the weight to be given findings of fact made in a law action with the weight to be accorded findings entered in a suit in equity.

The lower court's finding as to what constitutes a reasonable time is in no sense conclusive or binding

upon this court. ORS 17.440 provides that when equity cases are appealed "the cause shall be tried anew *without reference to such findings.*" (Italics mine.) Notwithstanding the apparent limitation of that statutory provision, it has long been settled in this state that when this court finds the evidence conflicting, the findings of the lower court may be considered as persuasive but not conclusive. In the first comprehensive discussion of the weight to be accorded such findings in equity, Mr. Justice WOLVERTON in *Nessley v. Ladd,* 29 Or 354, 364, 45 P 904 (1896), concluded:

> "* * * But it is the primary duty of this court to try the case anew,—that is, entire, upon the transcript and the evidence accompanying it; and *it is only for the purpose of resolving a doubt which may arise from the conflicting and contradictory nature of the evidence that the findings of the referee or the court below are resorted to and become of value,* and then it may be said to be a cogent argument that because of the superior advantages accorded them they are more likely to be right than this court could be if their findings should be entirely discarded." (Italics mine.)

As recently as 1951 *Nessley v. Ladd,* supra, was cited and approved by us, in *Ward v. Town Tavern et al.,* 191 Or 1, 37, 228 P2d 216, and should be deemed to be the law today.

This court is not bound to speculate on the reasons why both plaintiffs and defendant failed to meet the burden to support their respective theories on the question of reasonable time for removal. This situation probably arises from a misconception of their respective responsibilities in carrying the burden as to whether or not the condition subsequent, which was an incident of defendant's title, had occurred or had not occurred. This would account for the extended effort

that the defendant needlessly and unsuccessfully made in conjunction with the presentation of its prima facie case by then attempting to show that the time for removal of the timber had not elapsed and that defendant's rights therein had not been forfeited. Plaintiffs apparently shared the idea that the burden of such a showing rested not on them but on the defendant lumber company because of its anticipatory pleas; and they, therefore, contented themselves with the lesser and insufficient proof which they adduced through Hoffman.

The foregoing conclusions with respect to the insufficiency of evidence on the vital question of what constitutes a "reasonable time" renders extensive, if, indeed, any, comment unnecessary as to appellants' first and third propositions urged as additional reasons for negativing respondent's claim of interest in the timber. It will be recalled that the first was a contention that all merchantable timber owned by the lumber company had been cut and removed, and the third one was conditioned that if any such timber remained, the lumber company had relinquished its right thereto by reason of the statements it had filed with the county assessor.

Both propositions have been given earnest consideration and no merit is found in either. My views on both are in accord with that part of the circuit court's Finding VI reading: "On the two tracts there is a total of 3,347,000 feet of merchantable timber that had been purchased by defendant's predecessor in 1939, had been paid for in full, and the title to which is now in defendant."

Appellants' third contention is predicated solely upon six affidavits in evidence. These were originally filed by defendant with the assessor from time to time to disclose to that official that taxable timber had been

removed from areas therein described. The lumber company claims that they were based upon false or inaccurate information supplied by the gypo contractors who logged the areas for the defendant. The lower court so found and accorded them no value.

The majority refer to these affidavits and speak of their "evidentiary value", saying they are content that the affiants "knew what they were doing" when they signed them; but that opinion fails to state what "evidentiary value" they have. The only claim that plaintiffs make for these affidavits is found in their brief which reads: "Filing of the timber affidavits and ceasing to pay taxes constituted a relinquishment of all its [defendant's] timber rights pursuant to the 1939 contract and deeds." They also say in their brief: "* * * We submit that filing the affidavits and stopping payment of taxes was a clear expression of its right to relinquish its interest under this deed whether the timber was removed or not."

Although the word "relinquishment" is employed by plaintiffs, it is synonymous with the word "abandonment". In the law of property, "abandonment" means the relinquishment of all title, possession or claim or virtually throwing the property away. *In re Hess' Estate* (Sur) 257 NYS 278, 143 Misc 335. Also see *Sharkey v. Candiani,* 48 Or 112, 126, 85 P 219, 7 LRA NS 791, reading: "* * * Abandonment * * * is generally understood to mean the intentional relinquishment of a known right: *Oviatt v. Big Four Min. Co.,* 39 Or 118 (65 Pac. 811)."

In the absence of a statement elucidating what the majority conceive to be the "evidentiary value" of the timber affidavits, it is a fair assumption that the majority are claiming that they evidence the relinquishment or abandonment of title just as the plaintiffs

claim they do, for it is clear from the brief that was the purpose for which the affidavits were introduced. Certainly, no other kind of evidentiary value is claimed by the plaintiffs.

Assuming for the moment, but not conceding, that an abandonment of a title and estate in real property can be accomplished by acts less than the giving of a deed or court action, it is obvious that the affidavits did not accomplish that result. This is true even though one also holds that the affiants are irrevocably bound by the incorrect information supplied by the gypo loggers. The following reasons warrant this conclusion: (1) only one deed in evidence bound the lumber company to pay one third of the taxes levied against the timber on what has been heretofore described as the Hughes tract of 1,160 acres; (2) so far as I can determine from the evidence, no affidavits of cut-off were filed as to 3 forties of the Hughes area and 7 forties of the Pearson tract, thus leaving approximately 400 acres of timberland *not* "abandoned", that is, if we accept plaintiffs' theory of abandonment; and (3) a form of relinquishment by the lumber company of defendant's rights in the timber conveyed by the deed to the Hughes tract is provided in that instrument in these words: "* * * the grantee [lumber company] * * * may relinquish its interest in the property at any time by giving written thirty days notice to the owners of the above described property * * *." No notice of this kind was given, nor is it so claimed by plaintiffs.

However, can one actually and legally accomplish an abandonment of title in real property in the manner suggested by plaintiffs and apparently approved by the opinion of the majority? I earnestly submit that it cannot be done. In so saying, one must be mindful

that in this jurisdiction it is well established that ownership in growing timber is an estate in real property which, in the instant matter, is vested in the lumber company; and as far as I am informed, such a title can be divested only by deed or some action in a court of record. The following will be found in 73 CJS 208, Property, § 15:

> "Mere inaction or indifference of a fee owner will not divest his title. Disclaimer of freehold can be only by deed or in court of record. One cannot divest himself of title to land by mere declarations that he does not own or claim any of it, and a vested title to land cannot be lost by oral admission that it is the property of another. * * *"

1 Am Jur 5, Abandonment, § 6. We are also so taught by *Sharkey v. Candiani,* supra, where Mr. Justice MOORE says, at p. 126:

> " * * * An abandonment results from a mere exercise of the will.
>
> "So far as it relates to a vested estate in real property an abandonment is ineffectual to transfer the title: City of Philadelphia v. Riddle, 25 Pa. 259."

Also see *East Tennessee Iron & Coal Co. v. Wiggin,* 68 Fed 446, 449, an opinion by Mr. Justice Lurton while on the circuit court of appeals, sixth circuit, concurred in by Mr. Justice Taft, also a member of that court at that time, wherein it is said:

> "Precisely what is meant by 'an abandoned' legal title is hard to define. If it is the valid legal title, it is inconceivable how it can be abandoned. McCoy's [the grantee's] disappearance and long neglect to assert the title which appellants claimed he acquired by his adverse possession did not operate to extinguish or toll it; nothing but a possession adverse to him for the statutory period would have such a consequence. Plaintiffs did not abandon their

title by neglecting for 40 years to take possession or bring action. If there has not been a devolution of title by operation of an adverse possession, their title is perfect, and their right of recovery would not be affected by a theoretical abandonment predicated alone upon a neglect of their estate. Upon the same ground, it is hard to perceive how McCoy's title has been lost by mere neglect for a shorter period. Nothing but a subsequent possession adverse to McCoy for the statutory period will affect the title acquired by his own earlier possession adverse to the Wiggin title."

It is interesting to note that in appellants' briefs little attention is given to this phase of the case, nor are we cited to one authority in support of their third proposition.

The majority opinion quotes from a finding of the lower court to the effect that "Sometime prior to 1949, representatives of the defendant examined the property and discovered that, in addition to those areas not logged at all, a large amount of merchantable timber remained upon the property." The majority opinion seeks to impeach the correctness of this finding by observing that the last affidavit filed was by one Allen L. Piper, a forester for the lumber company, and stresses the fact that it "was executed on February 28, 1949, obviously after the time when a representative of the defendant examined the property", implying it was *after* and not *prior* to 1949 as stated in the finding. A reading of the entire affidavit does not justify such a conclusion. The affidavit discloses that in the body of that instrument is a recital to the effect that the timber was removed and logged off the areas described in the printed form of the affidavit "subsequent to March 1, *1949* and between the — day of ——————, 19—, and the 31 day of December,

1948". (Italics mine.) Only one conclusion can be drawn and that is it refers to timber cut sometime between March 1, 1948, the last date of assessment, and December 31, 1948, for the reason that it was filed with the clerk on February 28, 1949, subsequent to the 1948 logging and prior to "March 1, 1949". Moreover, although it describes 200 acres, only 160 acres are involved in this controversy. The conclusion attempted to be drawn from the date of its execution, standing alone, is insufficient to cast a cloud on the soundness of the court's finding.

The purpose of the Piper affidavit obviously was to exonerate property described therein from a levy of taxes for the year 1949 as to logs taken from it in 1948. In that respect it follows the overall pattern and purpose of the other five affidavits by indicating the cut made in various areas since the last March 1 assessment date. To give it any other concept would be to render it a futile transaction with no purpose.

It is my opinion that plaintiffs have failed to sustain the burden imposed upon them by the allegations contained in paragraph IV of their complaints, namely, that "Defendant claims some interest or estate in said real property adverse to plaintiffs, but said claim is false and without any right." That alone justifies the result I feel appropriate in this matter.

To have successfully met the issue raised by defendant's denial of this allegation and to have overcome the lumber company's prima facie showing of title in the timber, plaintiffs were bound to prove that a reasonable time for a removal of the timber had long since expired and, as a result, the defendant's claim of title in any remaining timber was forfeited. For this reason plaintiffs' complaints should be dismissed.

Defendant, on the other hand, failed to establish

that a reasonable time for removal had not elapsed or what was a reasonable time after February 1939 in which to remove the timber. In the absence of such proof, there is no foundation for those portions of paragraphs 3, 4 and 7 of the decree which refer to or depend upon "December 31, 1955" as the terminal date of defendant's right of removal; and the decree should be so modified.

I cling to the opinion that the decree of the lower court should be affirmed as modified in accordance with the suggestions above made.

Mr. Justice Tooze joins in this dissent.

56

Respondent's Petition for Rehearing

*Mahoney & Fancher,* Heppner, and Krause, Evans & Lindsay, Portland, for the petition.

*Koerner, Young, McColloch & Dezendorf* and *William J. Moshofsky,* contra.

Before Latourette\*, Chief Justice, and Warner\*\*, Lusk, Brand and Tooze, Justices.

LATOURETTE, J.

Defendant Heppner Lumber Company, a corporation, has filed a petition for rehearing with accompanying brief. Our attention is called to the fact that

\* Chief Justice when this case was argued.
\*\* Chief Justice when this opinion was rendered.

we erred in concluding that the pine reserved in the conveyance was limited to merchantable pine instead of "all" pine as unequivocably stated in the deeds. This is true. However, this does not make any difference in the result reached as we are still firmly of the conviction that a reasonable time had elapsed for the removal of both pine and fir timber.

We are charged with error in "holding that the words 'all pine and merchantable fir' in 1939 meant only that pine and fir which could be logged on a profitable basis." We did not so hold. Because we relied somewhat on the testimony of witness Hoffman who testified on cross-examination that the timber not removed was not merchantable for the reason that it was unprofitable for defendant to remove it, defendant asserts that we adopted his definition of merchantable timber. He did testify however, as pointed out in our opinion, that all timber that had a commercial value in 1939 had been removed. In *Monger v. Dimmick*, 187 Or 253, 210 P2d 929, cited by defendant in his brief on petition for rehearing, we said that merchantable timber is "all timber * * * that had * * * a commercial value in that locality * * *."

As pointed out in *Dahl v. Crain*, 193 Or 207, 237 P2d 939, it is difficult to define merchantable timber which will fit all occasions in all localities. It has no definite fixed meaning and many factors must be considered in a given case in determining what is or is not merchantable.

It is next asserted that the "court erred in abandoning its long established equity rule that findings of the trial judge upon conflicting evidence will not be disturbed." We know of no such rule. However, we have often said that where there is a conflict in testimony we should give great weight to the findings of the trial

judge since he saw and heard the witnesses. We have a duty to perform by trying an equity case de novo.

It will be remembered that defendant was paying taxes on the timber and in order to remove its obligation the affidavits were executed. Because the officers and directors of the defendant company testified that they were misled when they signed the affidavits does not necessarily establish that fact. The record itself, in our opinion, belies their testimony. Four affidavits were filed with the assessor by P. W. Mahoney, attorney for and an original incorporator of the defendant company. He was its director and became its secretary in 1942. As to the foundation for his affidavits, we have his testimony:

"Q What you know about whether the timber came off or not is from reports to you by employees, is that right? A By employees and independent gypo contractors."

Orville Smith, vice-president and general manager of the company, executed one affidavit. He testified that he had done logging himself and that he was through this property any number of times between 1939 and 1951. The other affidavit was made by Allen L. Piper, forester of the company, who executed his affidavit after the defendant admittedly had examined the property.

To give credence to their testimony we would have to find defendant's employees and contractors guilty of fraud and deceit. In addition there would have been another fraud perpetrated on the county in depriving it of its taxes. We are inclined to believe that the testimony of these officers was prompted by a desire to profit because of the skyrocketing of timber prices some four years after it ceased operations. Their memories were obviously faulty.

It is next argued that on the authority of *Monger v. Dimmick,* supra, defendant was not limited to the timber that was merchantable in 1939. In that case we quoted from *Adams v. Hazen,* 123 Va 304, 96 SE 741. It has never been the law in Oregon that merchantable timber is that timber which has commercial value "during the life of the contract." This clause was inadvertently included in the Monger quotation. *Tenny v. Mulvaney,* 9 Or 405; *Parsons v. Boggie,* 139 Or 469, 11 P2d 280; *Rayburn et ux. v. Crawford et ux.,* 187 Or 386, 211 P2d 483.

It is lastly urged that two forty-acre tracts were not logged during the eight years of operations. The testimony discloses that some of the timber which was unremoved was inaccessible on account of being in deep ravines or on high peaks. Whether or not the timber on the two tracts in question was included in the inaccessible timber is not disclosed by the evidence so, considering the evidence in its entirety, it must be assumed that that timber was likewise inaccessible.

Petition denied.

WARNER, C.J., and TOOZE, J., dissent.